# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

DRIVE LOGISTICS LTD,

        Plaintiff,                        Case No. 14-10289

v.                                       Hon. Gerald E. Rosen

PBP LOGISTICS LLC, PIECE BY
PIECE INVESTMENTS, INC., and
LEAR CORPORATION,

        Defendants.

_____/

## OPINION AND ORDER REGARDING
## CROSS-MOTIONS FOR SUMMARY JUDGMENT

At a session of said Court, held in
the U.S. Courthouse, Detroit, Michigan
on _____ July 20, 2016 _____

PRESENT:  Honorable Gerald E. Rosen
                      United States District Judge

## I.  INTRODUCTION

Plaintiff Drive Logistics Ltd commenced this case in this Court on January

22, 2014, asserting a variety of state-law claims against Defendants PBP Logistics

LLC, Piece By Piece Investments, Inc. and Lear Corporation arising from

Defendants' alleged failure to pay Plaintiff for freight transportation services it

provided over a several month period in 2013.  This Court's subject matter

jurisdiction over this matter rests upon the diverse citizenship of the parties. *See* 28 U.S.C. § 1332(a).

Through the present cross-motions, Plaintiff and Defendant Lear each request an award of summary judgment in their favor on the claims asserted against Lear in counts V through VII of Plaintiff's complaint.[1]  In support of its motion, Plaintiff argues that Lear is obligated as a matter of law to compensate Plaintiff for its transportation of freight to and from Lear's facility in Hammond, Indiana, notwithstanding any payments Lear might have made to the PBP Defendants for these transportation services, where Lear either signed or issued a bill of lading in connection with each such shipment.  In response, and in support of its own cross-

---

[1]In counts I through III of its complaint (there is no count IV in this pleading), Plaintiff asserted claims of breach of contract, promissory estoppel, and account stated against Defendants PBP Logistics LLC and Piece By Piece Investments, Inc. (collectively the "PBP Defendants").  By order dated April 21, 2014, the Court entered a default judgment in favor of Plaintiff and against the PBP Defendants on these claims, awarding Plaintiff the sum of $1,112,870.78 in compensatory damages.

In addition to these claims advanced by Plaintiff, Defendant Lear asserted crossclaims of breach of contract, indemnification, and conversion against the PBP Defendants.  These crossclaims, like the claims asserted by Plaintiff, were resolved through the entry of a June 30, 2015 default judgment in favor of Defendant Lear and against the PBP Defendants, with the Court ordering the PBP Defendants to pay Lear (i) all amounts awarded in favor of Plaintiff and against Lear under counts V through VII of Plaintiff's complaint, and (ii) all costs and expenses, including reasonable attorney fees, incurred by Lear in defending this action.  Because all of the claims asserted against the PBP Defendants have been resolved through the entry of default judgments, only the claims brought by Plaintiff against Defendant Lear remain at issue.

2

motion, Lear contends that any such obligation of payment that might arise from the bills of lading issued for shipments to and from Lear's Hammond facility is superseded by Plaintiff's execution of a "master transportation agreement" prepared by the PBP Defendants, under which Plaintiff purportedly agreed to collect the charges for its freight services solely from the PBP Defendants, and to waive any right to collect these freight charges from a PBP customer such as Lear.

Plaintiff's and Defendant Lear's cross-motions have been fully briefed by the parties. Having reviewed the parties' briefs and accompanying exhibits, as well as the remainder of the record, the Court finds that the relevant allegations, facts, and legal arguments are adequately presented in these written submissions, and that oral argument would not aid the decisional process. Accordingly, the Court will decide the parties' cross-motions "on the briefs." *See* Local Rule 7.1(f)(2), U.S. District Court, Eastern District of Michigan. This opinion sets forth the Court's rulings on these motions.

## II.  **FACTUAL BACKGROUND**

### A.    **The Parties**

Defendant Lear Corporation ("Lear) is a manufacturer of automotive seating and electrical components. Defendants PBP Logistics LLC and Piece By Piece Investments, Inc. (collectively the "PBP Defendants") were transportation brokers

3

that arranged for the shipment of freight on behalf of customers such as Lear.[2]

Plaintiff Drive Logistics Ltd, a Canadian corporation headquartered in Windsor,

Ontario, was one such trucking company retained by the PBP Defendants to carry

freight for Lear.

**B.     The PBP Defendants Enter into an Agreement to Provide Freight
         Transportation Services for Lear.**

        In 2011, Lear's third-party logistics provider, Ryder Integrated Logistics,

Inc. ("Ryder"), entered into an agreement with the PBP Defendants to transport

freight along a route between Texas and Lear's manufacturing facility in

Hammond, Indiana.  (*See* Defendant Lear's Motion, Ex. A, Motor Carrier General

Terms and Conditions (the "Ryder/PBP Agreement"); Ex. B, 9/7/2011 Award

Letter.)  Under the terms of this agreement, the PBP Defendants promised to

provide transportation services "using [their] own employees and drivers," and

agreed that they would "not broker and/or subcontract with other motor carriers or

entities to provide any transportation or other services under this Agreement"

unless they secured Ryder's "prior written approval."  (Lear's Motion, Ex. A,

_____

        [2]The president and co-owner of the PBP Defendants, Alexander Jones, has testified
that these two entities are no longer in operation.  (*See* Plaintiff's Motion, Ex. B, Jones
Dep. at 9-11.)  The PBP Defendants largely failed to participate in this litigation and, as
noted earlier, the Court entered default judgments against these defendants on the claims
and crossclaims asserted against them by Plaintiff and by co-Defendant Lear.

4

Ryder/PBP Agreement at ¶ 12.)[3]  Similarly, a memo issued by Ryder and signed by a representative of the PBP Defendants reiterated that "brokering to other carriers of loads tendered to [the PBP Defendants] by Ryder . . . on behalf of its shipper clients . . . is strictly prohibited," and the PBP Defendants agreed "to indemnify and defend Ryder and [its shipper clients] from any and all claims by third parties which result directly or indirectly from [their] brokering of a load to another carrier in violation of this memorandum."  (Lear's Motion, Ex. C, 5/9/2011 Memo to Carriers.)

## C.    The PBP Defendants Arrange for Plaintiff to Carry Lear's Freight on the Route Between Texas and Hammond, Indiana.

For the first several months of the agreement between Ryder and the PBP Defendants to provide freight transportation services between Texas and Lear's manufacturing facility in Hammond, Indiana, the PBP Defendants arranged for non-party Sunbelt Transportation to carry Lear's freight on this route.  In late 2012, the PBP Defendants invited Plaintiff to submit a bid to service this route, and Plaintiff's proposal was accepted.  Pursuant to this arrangement, Plaintiff provided freight transportation services to Lear on the Texas-Hammond route for

_____

[3]In Plaintiff's view, these were empty assurances, where the president and co-owner of the PBP Defendants, Alexander Jones, testified that the companies had no trucks or trailers and no office space during the relevant period in 2013.  (*See* Jones Dep. at 56, 59-60.)

5

approximately nine months in 2013.[4]

In the course of discovery in this litigation, the PBP Defendants produced a "Master Transportation Agreement" ("MTA") that states on its face that it was entered into between Plaintiff and the PBP Defendants on March 31, 2011. (*See* Defendant Lear's Motion, Ex. E, Master Transportation Agreement.)[5] The MTA recited that Defendant Piece By Piece Investments was a "licensed transportation broker and logistics company that arranges the transportation of freight under its contractual agreement[s] with various consignors and consignees or their agents," defined in the agreement as "customers," and it called for Plaintiff to transport freight on behalf of these customers of the PBP Defendants, subject to various terms and conditions. (MTA at 1.) Of particular relevance here, Plaintiff agreed to seek payment for the freight charges it incurred under the MTA solely from the PBP Defendants, and not from their customers:

> Piece By Piece shall pay Carrier [*i.e.,* Plaintiff] 40 to 45 days after
> Piece By Piece['s] receipt of Carrier's invoice, shipper's bill of lading,

---

[4]According to Lear, the PBP Defendants never sought or obtained the written approval of either Ryder or Lear to subcontract their shipping duties under the Ryder/PBP Agreement to Plaintiff (or any other carrier).

[5]This agreement was not signed by any representative of the PBP Defendants. (*See id.* at 6.) In addition, Plaintiff's president, Steven Breault, has testified that he never saw the MTA prior to this litigation, and that the employee who purported to sign this agreement on Plaintiff's behalf, Jeff Cameron, lacked the authority to bind Plaintiff to the terms of the MTA. (*See* Plaintiff's Motion, Ex. G, Breault Dep. at 22, 25.)

signed clear delivery receipt and other documents required by Piece By Piece or [its] Customer. Carrier agrees that it shall not bill the Customer, shipper/consignee or any third party directly nor shall it communicate in any manner, directly or indirectly[,] with Piece By Piece customers, consignors, consignees or any party other than Piece By Piece concerning the collection of any charges relating to transportation services accruing in connection with or as a consequence of this Contract; and waives any right it may otherwise have to proceed or commence any action against any Customer for the collection of any freight bills arising out of transportation services performed by [C]arrier under this contract.

(*Id.* at ¶ 8.)

Regardless of whether the MTA ever went into effect or governed Plaintiff's transport of freight between Texas and Lear's Hammond facility, the record indicates that Plaintiff's billing practices for freight charges incurred in the course of its relationship with the PBP Defendants were generally consistent with the terms of the MTA. According to Plaintiff's president, Steven Breault, Plaintiff submitted its bills to the PBP Defendants along with proof of delivery, and the PBP Defendants would then pay Plaintiff once they had secured payment from their customer. (*See* Breault Dep. at 12-13.) Breault further testified that this same arrangement governed the specific freight services at issue here — *i.e.,* Plaintiff's transportation of freight to and from Lear's Hammond facility — with Plaintiff submitting proof of delivery and an invoice to the PBP Defendants, the PBP Defendants in turn securing payment from Lear, and Plaintiff then receiving

7

payment from the PBP Defendants.  (*See id.* at 30-31.)

**D.    After Initially Making Some Payments, the PBP Defendants Cease to Pay Plaintiff for Its Transportation of Freight to and from Lear's Hammond Facility.**

In support of its claims in the present case, Plaintiff alleges that it was not paid for freight transportation services it provided to Lear between mid-February and late August of 2013 pursuant to its arrangement with the PBP Defendants. Although Lear states without contradiction that it paid the PBP Defendants for most or all of these freight services, (*see* Lear's Motion, Ex. H, Monday Decl. at ¶¶ 3-5), the PBP Defendants evidently failed to forward these payments to Plaintiff. Plaintiff's president, Steven Breault, testified that as the payments from the PBP Defendants became "spotty" in May or June of 2013 and Plaintiff's efforts to communicate with the PBP Defendants proved unavailing, Plaintiff gave notice to the PBP Defendants in late July of 2013 that "as of a specific date" in the near future, it would no longer transport freight on behalf of the PBP Defendants. (Breault Dep. at 34-35, 41.) Breault further testified that Plaintiff made no effort during this period to contact Lear regarding its difficulties in obtaining payment from the PBP Defendants, explaining that "we never contacted the customer directly in risk of being seen as someone who went around the broker, which can be detrimental to our business."  (*Id.* at 32-33.)

8

In all, Plaintiff asserts that it has not been paid for 310 "inbound" loads it carried from Texas to Lear's Hammond facility between February and August of 2013, and for 114 "outbound" loads that it carried from Hammond to Texas during this same time period. (*See* Plaintiff's Motion, Ex. C, Breault Decl. at ¶¶ 8-9.) According to Plaintiff, each such shipment is evidenced by a bill of lading that was either signed or issued by Lear. For the inbound shipments to Hammond, a Lear representative testified that the truck driver would present a bill of lading to an employee in Lear's receiving office upon arrival at the Hammond facility, and the Lear employee would then accept the delivery and sign and return the bill of lading to the driver. (*See* Plaintiff's Motion, Ex. D, Johnson Dep. at 16-22.) Similarly, for the outbound shipments from Hammond to Texas, Lear's representative testified that Lear would generate a return bill of lading for each such shipment. (*See id.* at 19.)[6]

Through its claims in the present suit, Plaintiff maintains that both the PBP Defendants and Lear are liable for the freight charges incurred by Plaintiff in transporting these specified inbound and outbound shipments. Plaintiff has

_____

[6]Plaintiff's present motion is accompanied by a voluminous three-volume exhibit that consists of bills of lading that were either (i) signed by a Lear employee and returned to Plaintiff's driver (in the case of inbound shipments), or (ii) generated by Lear and presented to Plaintiff's driver (in the case of outbound shipments). (*See* Plaintiff's Motion, Ex. H.) According to Plaintiff, this exhibit encompasses all of the shipments for which it seeks payment in this case.

9

secured a default judgment on its claims against the PBP Defendants, and it now

contends in its present motion that Lear is liable as a matter of law for the freight

charges that the PBP Defendants failed to pay, either by virtue of Lear's execution

of a bill of lading for each shipment carried by Plaintiff to or from Lear's

Hammond facility, or under a theory of unjust enrichment.  For its part, Lear

argues in its cross-motion that under the express terms of the MTA entered into

between Plaintiff and the PBP Defendants, Plaintiff has waived any claim to

collect unpaid freight charges from Lear, and must instead seek any such recovery

solely from the PBP Defendants.

## III. __ANALYSIS__

### A.    **The Standards Governing the Parties' Cross-Motions**

Through the present cross-motions, Plaintiff and Defendant Lear each seek

an award of summary judgment in their favor on the claims asserted by Plaintiff

against Lear.  Under the pertinent Federal Rule governing these motions, summary

judgment is proper "if the movant shows that there is no genuine dispute as to any

material fact and the movant is entitled to judgment as a matter of law."  Fed. R.

Civ. P. 56(a).  As the Supreme Court has explained, "the plain language of Rule

56[] mandates the entry of summary judgment, after adequate time for discovery

and upon motion, against a party who fails to make a showing sufficient to

establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986).

To the extent that a party seeks an award of summary judgment in its favor on an issue as to which that party bears the burden of proof — *e.g.,* Plaintiff's claim that Lear breached a contractual obligation to pay the freight charges incurred by Plaintiff, or Defendant Lear's appeal to the affirmative defense of waiver — the moving party's "showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party." *Calderone v. United States,* 799 F.2d 254, 259 (6th Cir. 1986) (internal quotation marks, citation, and emphasis omitted). Regardless of the allocation of the burden of proof, the central issue under Rule 56 is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251-52, 106 S. Ct. 2505, 2512 (1986).

In deciding a motion brought under Rule 56, the Court must view the evidence "in a light most favorable to the party opposing the motion, giving that party the benefit of all reasonable inferences." *Smith Wholesale Co. v. R.J. Reynolds Tobacco Co.,* 477 F.3d 854, 861 (6th Cir. 2007). Yet, the nonmoving

party may not rely on bare allegations or denials, but instead must support a claim of disputed facts by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials."  Fed. R. Civ. P. 56(c)(1)(A).  Moreover, any supporting or opposing affidavits "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."  Fed. R. Civ. P. 56(c)(4).  Finally, "[a] mere scintilla of evidence is insufficient" to withstand a summary judgment motion; rather, "there must be evidence on which the jury could reasonably find for the non-moving party."  *Smith Wholesale,* 477 F.3d at 861 (internal quotation marks and citation omitted).

**B.     Issues of Fact Remain as to Whether Plaintiff Waived Its Right to Recover from Defendant Lear Under the Master Transportation Agreement It Allegedly Entered into with the PBP Defendants.**

In count V of its complaint, Plaintiff seeks to recover from Defendant Lear under a breach of contract theory, contending that Lear is liable for the freight charges incurred by Plaintiff in carrying shipments to and from Lear's facility in Hammond, Indiana by virtue of Lear's signature on — or, in the case of outbound shipments, issuance of — a bill of lading for each such shipment.  As both Plaintiff

12

and Lear agree, a bill of lading "is the basic transportation contract between the shipper/consignor and the carrier," and provides the "default terms and conditions" for assessing liability for payment of freight charges. *Oak Harbor Freight Lines, Inc. v. Sears Roebuck & Co.,* 513 F.3d 949, 954 (9th Cir. 2008). Under the prevailing industry standard typically reflected in the default terms of a bill of lading, the consignor is primarily liable for the freight charges incurred by the carrier, but the consignee also may assume joint liability for these charges upon accepting delivery of the goods from the carrier.[7] *See Illinois Steel Co. v. Baltimore & Ohio R.R. Co.,* 320 U.S. 508, 512-13, 64 S. Ct. 322, 324-25 (1944); *Oak Harbor,* 513 F.3d at 954. In addition, there are provisions in a standard bill of lading that, if invoked by the parties, may alter this default apportionment of liability. *See Oak Harbor,* 513 F.3d at 954-55.[8] According to Plaintiff, the bills of

---

[7]Under the Federal Bill of Lading Act, 49 U.S.C. § 80101 *et seq.,* a "consignor" is defined as "the person named in a bill of lading as the person from whom the goods have been received for shipment," 49 U.S.C. § 80101(2), while a "consignee" is defined as "the person named in a bill of lading as the person to whom the goods are to be delivered," 49 U.S.C. § 80101(1). Thus, Defendant Lear was (i) the consignee as to inbound shipments carried by Plaintiff from Texas to Lear's Hammond facility, and (ii) the consignor as to outbound shipments carried by Plaintiff that originated at Lear's facility.

[8]As explained by the Ninth Circuit:

The bill of lading . . . contains "nonrecourse" and "prepaid" provisions that, if marked by the parties, release the consignor and consignee from liability for the freight charges. If the nonrecourse clause is signed by the consignor

13

lading for the shipments at issue in this case imposed either primary or joint liability on Lear for the freight charges incurred by Plaintiff in carrying these shipments, and it follows, in Plaintiff's view, that Lear must pay all such charges that the PBP Defendants left unpaid.  (*See* Plaintiff's Motion, Br. in Support at 21-25.)

For present purposes, at least, Lear does not dispute Plaintiff's contention that the bills of lading, viewed in isolation, would subject Lear to primary or joint liability for the freight charges sought by Plaintiff here.  Instead, Lear appeals to the principle, as recognized in the pertinent case law, that a bill of lading is not "the exclusive means of creating a contract," and that the parties may enter into a separate agreement that displaces the default allocation of liability in the bill of lading and dictates "when or by whom the freight charges should be paid."  *C.A.R. Transportation,* 213 F.3d at 479 (internal quotation marks and citations omitted).  In particular, Lear points to the "Master Transportation Agreement" ("MTA")

_____

and no provision is made for the payment of freight, delivery of the shipment to the consignee relieves the consignor of liability.  Similarly, when the prepaid provision on the bill of lading has been marked and the consignee has already paid its bill to the consignor, the consignee is not liable to the carrier for payment of the freight charges.

*C.A.R. Transportation Brokerage Company v. Darden Restaurants, Inc.,* 213 F.3d 474, 479 (9th Cir. 2000) (citations omitted).

allegedly entered into between Plaintiff and the PBP Defendants as altering the default terms of the bills of lading for the shipments carried by Plaintiff to and from Lear's Hammond facility.  More specifically, Lear cites the language in the MTA reflecting Plaintiff's agreement (i) not to "bill the [PBP Defendants'] Customer, shipper/consignee or any third party directly" or "communicate in any manner, directly or indirectly[,] with Piece By Piece customers, consignors, consignees or any party other than Piece By Piece concerning the collection of any charges relating to transportation services accruing in connection with or as a consequence of" the MTA; and (ii) to "waive[] any right it may otherwise have to proceed or commence any action against any Customer for the collection of any freight bills arising out of transportation services performed by [Plaintiff] under" the MTA.  (Defendant Lear's Motion, Ex. E, MTA at ¶ 8.)  In Lear's view, Plaintiff's execution of the MTA operated as a waiver of its right to recover freight charges from Lear under the terms of the bills of lading.

In support of this argument, Lear looks primarily to the Ninth Circuit's decision in *C.A.R. Transportation.*  In that case, one defendant, Darden Restaurants, purchased frozen shrimp from a co-defendant, Trans-Pac Foods, and the purchase price included freight charges for shipment from Trans-Pac's facility in Los Angeles to Darden's warehouse in Indianapolis.  Trans-Pac arranged for

15

shipment of the shrimp through a non-party transportation broker, Gulf Atlantic & Pacific ("GAP"), and this non-party broker, in turn, contracted with plaintiff C.A.R. Transportation, also a transportation broker, to identify carriers to transport the shrimp from Los Angeles to Indianapolis. C.A.R. Transportation selected three motor carriers for this task, and the bills of lading for these three shipments designated Trans-Pac as the shipper/consignor and Darden as the consignee. In addition to these bills of lading, however, the drivers for the three carriers "each signed a 'Waiver of Claim by Subcontractor,' waiving any claim the [c]arriers had against [Darden or Trans-Pac] for the payment of shipping charges." *C.A.R. Transportation,* 213 F.3d at 476 (footnote omitted).

Upon delivery of the shrimp, Trans-Pac paid the non-party broker, GAP, for the shipping charges, and plaintiff C.A.R. Transportation likewise billed GAP for these charges. C.A.R. Transportation never received payment, however, and GAP filed for bankruptcy protection soon thereafter. C.A.R. Transportation then brought suit against Darden and Trans-Pac, arguing that they were liable for the freight charges incurred by the carriers under the terms of the bills of lading issued in connection with the transportation of the shrimp. The district court awarded summary judgment in favor of Darden and Trans-Pac, however, finding that the waivers signed by the drivers for the carriers supplanted the default allocation of

16

liability in the bills of lading, and that these waivers foreclosed any recovery against Darden or Trans-Pac for the shipping charges incurred by the carriers.

The Ninth Circuit affirmed the district court's decision in favor of Darden and Trans-Pac.  In so ruling, the court explained that "an external contract, entered into by the [c]arriers, lawfully allocated liability for the freight charges," thereby rendering it "unnecessary" to look to the bills of lading for the apportionment of liability.  *C.A.R. Transportation,* 213 F.3d at 479.  Because "[t]he waivers signed by the drivers lawfully operated to waive the [c]arriers' rights against [Darden and Trans-Pac] for the freight charges," the Ninth Circuit found that summary judgment had properly been awarded in favor of these two defendants.  213 F.3d at 479.  Likewise, in the present case, Defendant Lear contends that the waiver provision in the MTA executed by Plaintiff supersedes the allocation of liability established in the bills of lading for the relevant shipments, and prevents Plaintiff from seeking to recover its freight charges from Lear.

Plaintiff challenges this reasoning on several grounds, most of which the Court finds unpersuasive.  First, Plaintiff suggests that the ruling in *C.A.R. Transportation* is distinguishable, and that the facts here are more akin to those addressed by the Ninth Circuit in *Oak Harbor,* 513 F.3d 949.  In this latter case, defendant Sears Roebuck & Co. ("Sears") retained co-defendant National Logistics

17

Corporation ("NLC"), a transportation broker, to arrange for the shipment of freight to and from Sears' warehouses.  NLC, in turn, entered into an agreement with plaintiff Oak Harbor Freight Lines ("Oak Harbor") to carry freight under NLC's brokerage arrangement with Sears.  Under the written "Carrier Contract" between NLC and Oak Harbor, NLC agreed to pay the carrier for its freight services "within a predetermined time from date of receipt regardless whether or not [NLC] ha[d] been paid" for its brokerage services.  *Oak Harbor,* 513 F.3d at 952.  When Oak Harbor carried a number of shipments of Sears' freight without receiving payment for its services,[9] it brought suit against both NLC and Sears to recover these outstanding freight charges.

Sears argued that it should not be held liable for the freight charges incurred by Oak Harbor, and that the carrier's sole recourse should be a recovery from NLC, but both the district court and the Ninth Circuit rejected this contention.  In so ruling, the Ninth Circuit first observed that Sears was liable to Oak Harbor under the default liability provisions in the bills of lading issued for the shipments at issue.  *Oak Harbor,* 513 F.3d at 955.  Although the court recognized that these default liability terms could be overridden "through a contract separate from the

---

[9]The record disclosed that Sears had paid NLC for some, but not all, of the freight services invoiced by Oak Harbor.

bill of lading," it rejected on several grounds Sears' appeal to the carrier contract between NLC and Oak Harbor as operating to supplant the liability imposed under the bills of lading. *Oak Harbor,* 513 F.3d at 956-57. First, the court noted that Sears was not a party to the carrier contract between Oak Harbor and NLC, and it opined that Sears had "cite[d] no authority to support its proposition that a contract between a carrier and a broker can modify the default liability provisions of a bill of lading." 513 F.3d at 956. Next, the court pointed out that the terms of the carrier contract itself lent no support to Sears' claim that this contract somehow relieved it of liability for Oak Harbor's freight charges, where (i) the carrier contract "never mentions or refers to Sears by name or description," (ii) it "makes no express or implied statements that Sears will not pay Oak Harbor for the shipments" or that "Oak Harbor will not seek payment from Sears," and (iii) the contract "contains no waivers — express or implied — of the default liability provisions in the bills of lading." 513 F.3d at 956, 957 n.6. Thus, because the carrier contract "merely provide[d] that NLC will be liable for freight charges regardless whether or not NLC is paid," and neither stated nor "impl[ied] that Sears is not liable" for these charges, the Ninth Circuit held that this contract "did not alter Sears' liability for the freight charges under the bills of lading." 513 F.3d at 956-57 (footnotes omitted).

19

While both *C.A.R. Transportation* and *Oak Harbor* address issues similar to those presented here, they differ in ways that, by and large, make the ruling in the former case more applicable than the latter in resolving the present motions. First, and most importantly, the MTA allegedly executed by Plaintiff here, unlike the agreement signed by the plaintiff carrier in *Oak Harbor,* expressly (i) prohibits Plaintiff from billing or communicating with the customers of the PBP Defendants, consignors, consignees or "any party other than" the PBP Defendants concerning the collection of freight charges incurred under the MTA, and (ii) "waives any right [Plaintiff] may otherwise have to proceed or commence any action against any Customer [of the PBP Defendants] for the collection of any freight bills arising out of transportation services performed by [Plaintiff] under" the MTA. (Defendant Lear's Motion, MTA at ¶ 8.) Accordingly, just as the agreement under consideration in *C.A.R. Transportation* included a provision in which the carrier expressly waived any claim to recover its freight charges from either the shipper (Trans-Pac) or its customer (Darden), the agreement produced by Defendant Lear in this case features an express waiver of Plaintiff's right to bring an action against any customer of the PBP Defendants for the collection of freight charges arising from transportation services provided under this agreement. The carrier contract at issue in *Oak Harbor,* in contrast, lacked any such waiver, either "express or

implied," of carrier Oak Harbor's right to seek payment from Sears. *Oak Harbor,* 513 F.3d at 956, 957 n.6.

Nonetheless, Plaintiff notes that it allegedly entered into the MTA with the PBP Defendants, and not Lear, and it points to the Ninth Circuit's observation in *Oak Harbor* that Sears had failed to identify any "authority to support its proposition that a contract between a carrier and a broker can modify the default liability provisions of a bill of lading." *Oak Harbor,* 513 F.3d at 956. It follows, in Plaintiff's view, that Lear likewise cannot appeal to an agreement between a broker and a carrier — namely, the MTA — as a basis for avoiding the liability it otherwise would bear under the bills of lading for the shipments to and from its Hammond facility.

Yet, while it is arguably true that the contract at issue in *C.A.R. Transportation* was entered into by parties to the bills of lading — *i.e.,* the shipper, Trans-Pac, and the carrier — who agreed through this contract to alter the default allocation of liability established in the bills of lading,[10] it is also true that the

_____

[10]To be accurate, the opinion in *C.A.R. Transportation* never actually identifies the other party to the agreements in which the carriers waived their right to recover their freight charges from Trans-Pac or its customers. *See C.A.R. Transportation,* 213 F.3d at 476-77 & n.2. For all that appears in the Ninth Circuit's ruling, the plaintiff transportation broker, C.A.R. Transportation, could have been the party that presented the waivers to the carriers for their signatures. If so, the distinction drawn by Plaintiff here would not exist, and the Ninth Circuit would have overlooked its own decision in *C.A.R. Transportation* when it stated in *Oak Harbor* that there appeared to be "no authority" for

21

waiver granted by the carrier under this contract was not limited in its effect to the other contracting party (Trans-Pac), but was also found to extend to a non-party (Darden).  Just as Darden was found to be shielded from liability through a contractual waiver that encompassed Trans-Pac and its "customer," *C.A.R. Transportation,* 213 F.3d at 476-77 n.2, Defendant Lear in this case presumably may claim protection from liability under the contractual waiver alleged executed by Plaintiff, which extended by its express terms to the "Customer[s]" of the PBP Defendants.  Under the reasoning of *C.A.R. Transportation,* then, Lear need not have been a party to the MTA to claim the protection conferred under the provision of this agreement that waived Plaintiff's right to collect its freight charges from the customers of the PBP Defendants.

The Michigan courts likewise have confirmed that a contractual waiver or release is not limited in its reach to the contracting parties, but may also confer benefits on third parties.[11]  In *Romska v. Opper,* 234 Mich. App. 512, 594 N.W.2d

_____

the "proposition that a contract between a carrier and a broker can modify the default liability provisions of a bill of lading."  *Oak Harbor,* 513 F.3d at 956.  In any event, this Court fails to see, and the court in *Oak Harbor* does not explain, why a carrier's waiver of rights it otherwise would have under a bill of lading should be effective only if this waiver is contained in a contract with another party to the bill of lading, and not if a transportation broker secures this waiver from the carrier on behalf of its customer.

[11]Throughout their briefing, the parties here make no effort to identify the law that should govern the Court's determination whether Defendant Lear is liable to pay the freight charges incurred by Plaintiff.  The MTA, however, expressly provides that it

853, 855-56 (1999), for example, the plaintiff was injured when his car was struck by another vehicle, and he entered into a settlement agreement with the insurer of this other vehicle.  In connection with this settlement, the plaintiff signed a form in which he released the driver and owner of the other vehicle, as well as "all other parties, firms, or corporations who are or might be liable," from "all claims of any kind or character" arising from the accident.  *Romska,* 594 N.W.2d at 856.  When the plaintiff subsequently brought suit against another individual, David Opper, who allegedly was involved in the accident, the state trial court dismissed the case as barred by the broad language of the release executed by the plaintiff.  The Michigan Court of Appeals affirmed this ruling, explaining that Opper "clearly fits within the class" of individuals and entities specified in the release executed by the plaintiff, and opining that "we are aware of no legal rule in Michigan that precludes settling parties from waiving whatever rights they choose."  *Romska,* 594 N.W.2d at 856-57; *see also Collucci v. Eklund,* 240 Mich. App. 654, 613 N.W.2d 402, 404 (2000) (citing the "well settled" principle of Michigan law that "the scope

---

"shall be governed by and construed in accordance with the laws of the State of Michigan."  (MTA at ¶ 25.)  In addition, the parties cite Michigan law in addressing various issues relating to the MTA, such as (i) Defendant Lear's claim that it is a third-party beneficiary of the promises made by Plaintiff under the MTA, and (ii) Plaintiff's contention that the MTA was not signed by anyone with the authority to bind Plaintiff to its terms.  Accordingly, the Court deems it appropriate to look to Michigan law in determining the scope and effect of the MTA's waiver provision.

of a release is governed by the intent of the parties as expressed in the release," and rejecting the plaintiff's contention in that case "that the release does not apply to his claims against [the] defendants because they were not parties to the execution of the release and did not provide consideration for the release").

Applying this principle of Michigan law here, the waiver provision in the MTA allegedly executed by Plaintiff unquestionably is broad enough to encompass the breach of contract claim asserted by Plaintiff against Defendant Lear. Assuming, for the moment, that the MTA is enforceable against Plaintiff — an issue addressed immediately below — Plaintiff expressly agreed to "waive[] any right it may otherwise have to proceed or commence any action against any Customer for the collection of any freight bills arising out of transportation services performed by [Plaintiff] under" the MTA.  (MTA at ¶ 8.)  While Plaintiff suggests that Lear does not qualify as a "Customer" within the meaning of this waiver provision, the MTA elsewhere defines the "[C]ustomer[s]" of the PBP Defendants as the "various consignors and consignees or their agents" with which the PBP Defendants entered into "contractual agreement[s]" to "arrange[] the transportation of freight," (MTA at 1), and Plaintiff expressly acknowledges that Lear was either the consignor or the consignee for each of the shipments at issue in

24

this case, (*see* Plaintiff's Response to Lear's Motion at 18).[12]  Consequently, Lear

lies within the scope of the waiver allegedly executed by Plaintiff, and Lear's

status as a non-party to the agreement that contains this waiver does not preclude it

from invoking the waiver to avoid liability for the freight charges incurred by

Plaintiff under its broker/carrier arrangement with the PBP Defendants.[13]

_____

[12]Plaintiff also notes that in Lear's answer to the complaint, Lear denied that it was a customer of co-Defendant PBP Logistics LLC.  (*See* Defendant Lear's 2/13/2014 Answer at ¶ 9.)  The term "customer" as used in Plaintiff's complaint, however, need not be given the same interpretation as when it is used (and defined) in the MTA.  Lear's denial in its answer presumably reflects the presence of an intermediary, Ryder, between Lear and the PBP Defendants, but Ryder's status as Lear's agent does not preclude Lear from qualifying as a "Customer" within the meaning of this term as used in the MTA.

[13]In the briefing on their cross-motions, the parties extensively address the question whether Lear qualifies as a third-party beneficiary of the MTA under the Michigan statute, Mich. Comp. Laws § 600.1405, that governs this inquiry.  The Court views this issue as largely immaterial to the resolution of the present motions, in light of the above-cited Michigan case law that allows a non-party to a contract to invoke a contractual waiver or release that, by its terms, is broad enough to encompass the non-party.  Because the courts in these cases did not conduct an inquiry into third-party beneficiary status under § 600.1405, the Court believes that it need not do so here.

To be sure, other cases decided under Michigan law have engaged in an inquiry under § 600.1405 before deciding whether a non-party to a contract may appeal to a waiver or release contained in the contract.  In *Taggart v. United States,* 880 F.2d 867, 869-70 (6th Cir. 1989), for instance, the Sixth Circuit looked to § 600.1405 in determining that the federal government was entitled to the benefit of a broad release entered into by the plaintiff and a church to resolve a claim arising from the plaintiff's slip and fall that occurred either on church property or on the property of an adjacent post office.  Similarly, in *Shay v. Aldrich,* 487 Mich. 648, 790 N.W.2d 629, 638-40, 644-46 (2010), the court found that police officers employed by one municipality were third-party beneficiaries of a settlement reached between the plaintiff and police officers employed by another municipality, but the court then remanded the case for further proceedings in light of an ambiguity as to the scope of the release executed by the plaintiff in connection with the settlement.  *See also Hoogland v. Kubatzke,* No. 307459,

Plaintiff next insists that Lear must stand in the shoes of the PBP Defendants

as it seeks to enforce the MTA's waiver provision, and that the PBP Defendants

can no longer enforce this provision in light of their prior breach of a primary

obligation owed under the MTA — namely, the obligation to pay Plaintiff for the

---

2013 WL 331580, at *2 (Mich. Ct. App. Jan. 29, 2013) (holding that the defendant
managers and executive officers of Delta College were not third-party beneficiaries of an
employment contract entered into by the plaintiff and Delta College, and that these
defendants therefore were not entitled to invoke the shortened period of limitation set
forth in the employment contract).  These cases arguably are in some tension with the
decisions cited earlier in this opinion, in which Michigan courts determined the scope of a
waiver or release without inquiring whether the non-party seeking the benefit of this
contractual provision qualified as a third-party beneficiary under § 600.1405.  *See Shay,*
790 N.W.2d at 659-60 (Markman, J., dissenting) (contending that the third-party
beneficiary inquiry engaged in by the majority in that case was relevant only "because it
precludes a court from considering [the] plaintiff's motion for reformation" of the
underlying settlement agreement, and not because it affected the interpretation of the
release contained in the settlement agreement).

In any event, even assuming that such an inquiry is necessary here, the Court
readily concludes that Defendant Lear satisfies the criteria set forth in § 600.1405 for
establishing that it is a third-party beneficiary of the MTA.  As explained by the Michigan
Supreme Court, "[a] person is a third-party beneficiary of a contract only when that
contract establishes that a promisor has undertaken a promise directly to or for that
person."  *Schmalfeldt v. North Pointe Insurance Co.,* 469 Mich. 422, 670 N.W.2d 651,
654 (2003).  The court has emphasized, however, that a third-party beneficiary "may be a
member of a class," so long as this class is "sufficiently described" in the contract.  *Shay,*
790 N.W.2d at 638 (internal quotation marks and footnote with citation omitted).  The
MTA satisfies this requirement through the promise made by Plaintiff not to "commence
any action against any Customer for the collection of any freight bills arising out of
transportation services performed by [Plaintiff] under" the MTA, (MTA at ¶ 8), and
through the language elsewhere in the MTA defining the "[C]ustomer(s)" of the PBP
Defendants as the "consignors and consignees or their agents" for whom the PBP
Defendants agreed to "arrange[] the transportation of freight, (*id.* at 1).  As discussed
earlier, Lear qualifies as a "Customer" within the meaning of this term in the MTA, and
thus is a member of the class that Plaintiff expressly promised not to sue in order to
recover the freight charges incurred through its relationship with the PBP Defendants.

26

shipments it carried on behalf of the PBP Defendants in accordance with the terms of the MTA.  This argument fails at the threshold, however, because the "stand in the shoes" limitation on which Plaintiff relies is a byproduct of the Michigan law governing third-party beneficiaries, *see Shay,* 790 N.W.2d at 640, and this Court has explained that Defendant Lear need not attain the status of a third-party beneficiary in order to invoke the waiver provision of the MTA.

In addition, the Supreme Court has emphasized that the "general rule" that a third-party beneficiary must stand in the shoes of the promisee is "merely a rule of construction useful in determining contractual intent," and that this principle "should not be applied so inflexibly as to defeat the intention of the parties." *Schneider Moving & Storage Co. v. Robbins,* 466 U.S. 364, 370-71, 104 S. Ct. 1844, 1848 (1984).  Thus, "[w]here the language of the contract, or the circumstances under which it was executed, establish that the parties have provided that the right of the beneficiary is not to be affected by any defenses that the promisor might have against the promisee, the rule is inapplicable." *Schneider Moving & Storage,* 466 U.S. at 371, 104 S. Ct. at 1848 (footnote omitted).  The contract language at issue here fits this description, given that the MTA's waiver provision is most likely to come into play when Plaintiff is unable to secure payment for its freight charges from the PBP Defendants, and therefore turns to

27

their customers for payment. If the PBP Defendants' default on their payment obligation were to prevent their customers from invoking the protection of the waiver provision, then the promise made by Plaintiff under this provision would be largely illusory. The Court does not view the law governing third-party beneficiaries as dictating this result.

As its next challenge to Lear's reliance on the MTA, Plaintiff points to the fact that this agreement was signed only by one of Plaintiff's employees, and not by a representative of the PBP Defendants, (*see* MTA at 6), and it argues that Lear has failed to establish that the PBP Defendants assented to the terms of the MTA. Yet, if Plaintiff means to suggest that Lear cannot invoke the waiver provision of the MTA as a defense against Plaintiff's breach of contract claim absent the PBP Defendants' signature on this document, Plaintiff has failed to cite any authority for this proposition, nor is the Court aware of any. *Cf.* Mich. Comp. Laws § 566.132(1) (providing that if an agreement is subject to the Michigan statute of frauds, this agreement is enforceable so long as it is "in writing and signed with an authorized signature ***by the party to be charged with the agreement***" (emphasis added)). As for Plaintiff's contention that Lear has failed to produce evidence of the PBP Defendants' consent to be bound by the MTA, such that there was the requisite meeting of the minds as to the terms of this agreement, Lear cites the

28

testimony of Alexander Jones, the president and co-owner of the PBP Defendants, that it was the standard practice of the PBP Defendants to insist that all carriers doing business with them must execute a master transportation agreement. (*See* Defendant Lear's Motion, Ex. D, Jones Dep. at 94-95.)[14]  In addition, the PBP Defendants produced the MTA in discovery, thus indicating that they secured Plaintiff's signature on this document and then preserved it as establishing the terms of the parties' broker/carrier relationship.

Lear further points to the actions taken by Plaintiff and the PBP Defendants as evidencing a meeting of the minds as to the arrangement reflected in the MTA. Consistent with the terms of the MTA —and inconsistent with Plaintiff's contention that the bills of lading should control the determination of liability for Plaintiff's freight charges — Plaintiff submitted invoices for its freight charges to the PBP Defendants, along with proof of delivery, and the PBP Defendants would then pay Plaintiff for its services. (*See* Defendant Lear's Motion, Ex. F, Breault

─────────────────

[14]At his deposition, Mr. Jones evidently was not presented with or asked to testify about the specific MTA that bears the signature of Plaintiff's representative.  Instead, he was asked mainly about a master transportation agreement entered into by the PBP Defendants and a different carrier, Sunbelt Transportation. (*See id.* at 94-95, 97.) Nonetheless, Mr. Jones testified that the contract executed by Sunbelt was a standard master transportation agreement that the PBP Defendants entered into with all carriers that moved freight on their behalf, and he specifically confirmed that Plaintiff would have been asked to enter into a master transportation agreement with the PBP Defendants as a condition of "mov[ing] freight for us." (*Id.* at 94-95, 97, 101.)

Dep. at 12-13, 30-31.)  Also consistent with the terms of the MTA — and, more specifically, paragraph 8 of this agreement, which contains the waiver provision that Lear seeks to invoke here — Plaintiff made no attempt to communicate with Lear regarding its unpaid freight charges until October of 2013, well after Plaintiff terminated its relationship with the PBP Defendants in late July or August of 2013. (*See id.* at 31, 33-36.)  The Michigan courts have recognized that "[a] meeting of the minds can be found from performance and acquiescence in that performance." *Sanchez v. Eagle Alloy Inc.,* 254 Mich. App. 651, 658 N.W.2d 510, 517 (2003); *see also Lakeshore Engineering Services, Inc. v. Target Construction, Inc.,* 2 F. Supp.3d 1038, 1049 (E.D. Mich. 2014).

Yet, while the Court agrees with Lear that this evidence demonstrates the existence of an agreement between Plaintiff and the PBP Defendants that encompasses at least some of the terms set forth in the MTA, it is another matter whether the record establishes Plaintiff's assent to the specific provision that Lear seeks to enforce here — namely, the waiver provision in paragraph 8 of this agreement.  Plaintiff's president, Steven Breault, flatly testified that there was no written agreement memorializing Plaintiff's relationship with the PBP Defendants. (*See* Defendant Lear's Motion, Ex. F, Breault Dep. at 27.)  If Lear is to overcome this testimony and establish as a matter of law that Plaintiff is bound by the MTA's

waiver provision, it must demonstrate Plaintiff's assent to this specific provision, and Lear's showing on this point rests solely on the signature of one of Plaintiff's employees, Jeff Cameron, that appears on the last page of the MTA.  (*See* MTA at 6.)

The Court finds that factual questions remain as to Mr. Cameron's authority to sign the MTA on Plaintiff's behalf.  Steven Breault expressly testified that Mr. Cameron lacked this authority, (*see* Breault Dep. at 25), and Mr. Cameron himself states in a declaration that he is "not authorized to bind [Plaintiff] to contracts," (Plaintiff's Response to Lear's Motion, Ex. A, Cameron 7/20/2015 Decl. at ¶ 3).[15] Lear has not pointed to anything in the record that would contradict this evidence that Mr. Cameron lacked the authority to bind Plaintiff to the terms of the MTA.

Instead, Lear seeks to establish that Mr. Cameron had apparent authority to sign the MTA on Plaintiff's behalf.  Under Michigan law, "[a]pparent authority may arise when acts and appearances lead a third person reasonably to believe that an agency relationship exists." *Meretta v. Peach,* 195 Mich. App. 695, 491 N.W.2d 278, 280 (1992).  "Apparent authority must be traceable to the principal

---

[15]Lear urges the Court to disregard this declaration, observing that it is unsworn and lacks the requisite affirmation from Mr. Cameron that his statements are true under penalty of perjury.  *See* 28 U.S.C. § 1746.  Plaintiff remedied this defect, however, in a supplemental declaration executed by Mr. Cameron on August 7, 2015.  (*See* Plaintiff's 8/7/2015 Suppl. Exhibits, Ex. F, Cameron 8/7/2015 Decl.).

and cannot be established by the acts and conduct of the agent." *Meretta,* 491

N.W.2d at 280.  "In determining whether an agent possesses apparent authority to

perform a particular act, the court must look to all surrounding facts and

circumstances."  491 N.W.2d at 280.

Under the record here, a trier of fact could conclude that Mr. Cameron had

apparent authority to bind Plaintiff to the terms of the MTA.  Although Plaintiff

seeks to characterize Mr. Cameron as a mere "data entry clerk," (Plaintiff's

Response to Defendant Lear's Motion at 6), he signed the MTA as a purported

"[a]dmin[istrator]" for Plaintiff, (MTA at 6), and Plaintiff's president agreed that

this document was "signed by an administrator at Drive Logistics," (Breault Dep.

at 22-23).[16]  Mr. Breault further testified that Mr. Cameron had contact with the

PBP Defendants "[o]n a weekly basis" in his role as a "load builder" for the

shipments carried by Plaintiff pursuant to its relationship with the PBP Defendants.

(*Id.* at 23-24.)  In addition, the Court has already noted the testimony that the PBP

---

[16]In his declaration, Mr. Cameron states that he does not recall signing the MTA, and he denies that he "knowingly sign[ed] any contract" on Plaintiff's behalf.  (Cameron 7/20/2015 Decl. at ¶ 4.)  Rather, he speculates that his signature appears on this agreement because it was interspersed with "load building documentation," and that he merely "signed for the receipt of" this collection of materials, including the MTA.  As Lear points out, however, this explanation is highly implausible, given that Mr. Cameron evidently initialed each page of the MTA other than the signature page.  In any event, it must be left for the trier of fact to determine whether Mr. Cameron knowingly signed the MTA.

Defendants entered into master transportation agreements with all carriers with whom they worked, as well as the PBP Defendants' insistence that Plaintiff would not have been allowed to carry freight for them unless it had executed such an agreement. (*See* Jones Dep. at 94-95, 101.) These facts and circumstances, viewed in their totality, could support a reasonable belief by the PBP Defendants that Mr. Cameron acted as Plaintiff's authorized agent when he signed the MTA.

Nonetheless, it cannot be said that Lear has established this issue of apparent authority in its favor as a matter of law. No representative of the PBP Defendants has given testimony concerning the circumstances surrounding the execution of the MTA, and the record therefore is wholly silent as to the PBP Defendants' belief or understanding regarding Mr. Cameron's authority to sign the MTA on Plaintiff's behalf. Moreover, Mr. Cameron has provided only a bare bones declaration in which he denies having even seen the MTA prior to this litigation, (*see* Cameron 7/20/2015 Decl. at ¶ 4), and he evidently was not deposed to explore his statements in this declaration. Given the dearth of evidence bearing upon the execution of the MTA, it must be left to the trier of fact to resolve the claim of apparent authority advanced by Lear. And because the resolution of this issue, in turn, will determine the outcome of Lear's appeal to the waiver provision in the MTA as a defense to Plaintiff's breach of contract claim, it follows that neither Plaintiff nor Lear is

33

entitled to an award of summary judgment in its favor on this claim.

## C. Issues of Fact Likewise Preclude an Award of Summary Judgment in Favor of Either Party on Plaintiff's Claims of Breach of an Implied Contract and Unjust Enrichment.

Count VI of Plaintiff's complaint asserts a claim of unjust enrichment against Defendant Lear.  In count VII of its complaint, Plaintiff seeks to recover its unpaid freight charges from Lear under an implied contract theory.  As discussed briefly below, just as issues of fact preclude the resolution of Plaintiff's breach of contract claim as a matter of law, the Court likewise cannot award summary judgment in favor of either party on the remaining claims asserted by Plaintiff against Lear.

First and foremost, the waiver provision in the MTA is not limited to any particular theory of recovery.  Rather, it broadly waives "any right [Plaintiff] may otherwise have to proceed or commence any action against any Customer [of the PBP Defendants] for the collection of any freight bills arising out of the transportation services performed by [Plaintiff] under" the MTA.  (MTA at ¶ 8.) Plaintiff does not contend that this provision, if enforceable, would extend to less than all of the theories of recovery it has asserted against Lear, nor does the Court see any basis for drawing such a distinction.  Accordingly, the outstanding issues of fact concerning Lear's effort to invoke the waiver provision of the MTA

preclude the Court from awarding summary judgment in either party's favor on any of the claims asserted by Plaintiff against Lear, regardless of the legal theory upon which these claims may be based.

Next, so long as Plaintiff still has a viable breach of contract claim against Lear, the Court may not rule as a matter of law on Plaintiff's alternative theories of recovery. Under Michigan law, a contract will not be implied if there is an express contract covering the same subject matter. *See Creelgroup, Inc. v. NGS American, Inc.,* No. 12-1686, 518 F. App'x 343, 347 (6th Cir. March 22, 2013); *Belle Isle Grill Corp. v. City of Detroit,* 256 Mich. App. 463, 666 N.W.2d 271, 280 (2003); *Martin v. East Lansing School District,* 193 Mich. App. 166, 483 N.W.2d 656, 661 (1992). Because Plaintiff seeks to recover from Lear under express contracts — *i.e.,* the bills of lading for each shipment at issue — and the viability of this express breach of contract claim rests upon issues of fact concerning Plaintiff's possible waiver of this claim, any implied-contract theories of recovery must await the trier of fact's resolution of these questions.

In short, the disposition of Plaintiff's claims against Defendant Lear turns almost entirely on outstanding issues of fact concerning the enforceability of the waiver provision in the MTA allegedly executed by Plaintiff. As observed earlier, the record bearing on this question is quite limited: the individual who allegedly

signed the MTA on Plaintiff's behalf, Jeff Cameron, has not been deposed, nor was

any representative of the PBP Defendants questioned about any specific written

agreement that governed the relationship between Plaintiff and the PBP

Defendants.  Because this is a key issue to the resolution of this case, and because

it is possible, if not likely, that further discovery could shed light on this issue and

perhaps obviate the need for trial, the Court will entertain a request from the parties

to reopen discovery for the limited purpose of exploring this specific issue.

Following this limited discovery effort, the Court will then consider whether to

allow additional motion practice arguing that the enforceability of the MTA should

be decided in favor of one party or the other as a matter of law.[17]

_____

[17]At the conclusion of the brief in support of its summary judgment motion,
Plaintiff invites the Court to impose sanctions on Lear for making allegedly false
statements in its answer to the complaint and in an interrogatory response suggesting that
it did not know that Plaintiff was carrying freight to and from Lear's Hammond, Indiana
facility.  Plaintiff asserts that as a result of Lear's allegedly false statements, it has been
"forced . . . to spend hundreds of thousands of dollars in legal fees litigating issues that
should not have been in dispute."  (Plaintiff's Motion, Br. in Support at 31.)

    Having considered this matter and reviewed the pertinent portions of the record,
the Court declines to sanction Lear for the statements complained of by Plaintiff.  First,
the record does not support Plaintiff's accusation that Lear has litigated in bad faith.
Rather, as Lear itself admits, the statements identified by Plaintiff were largely a product
of Lear's "inartful[]" failure to distinguish between the lack of knowledge of a unit within
the Lear corporate umbrella, Lear Logistics Management, and the facts known to Lear as
a whole.  (*See* Defendant Lear's Response to Plaintiff's Motion at 24.)  Next, it is difficult
to see, and Plaintiff does not explain, how Lear's inartful and arguably misleading
statements in its answer and in a single interrogatory response could have caused Plaintiff
to incur "hundreds of thousands of dollars in legal fees," where the key documents in this
case, the bills of lading, sufficiently disclose Plaintiff's status as the carrier of each of the

## IV.  <u>CONCLUSION</u>

For the reasons set forth above,

NOW, THEREFORE, IT IS HEREBY ORDERED that Plaintiff's June 24, 2015 motion for summary judgment (docket #82) is DENIED.  IT IS FURTHER ORDERED that Defendant Lear's June 24, 2015 motion for summary judgment (docket #80) likewise is DENIED.

s/Gerald E. Rosen
United States District Judge

Dated:  July 20, 2016

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on July 20, 2016, by electronic and/or ordinary mail.

s/Julie Owens
Case Manager, (313) 234-5135

---

shipments at issue.  In light of the ample paper trail establishing Plaintiff's role in these shipments, Lear's claimed ignorance of this role seemingly has little or no legal significance to the disposition of Plaintiff's claims.  In any event, the extent of Lear's knowledge of Plaintiff's role would inevitably have been disclosed through the parties' ordinary discovery efforts, so it is doubtful that Plaintiff was significantly prejudiced by Lear's objectionable statements in its answer and an initial discovery response.  Finally, Plaintiff has presented its request for sanctions largely as an afterthought tacked to the end of its summary judgment brief, and the argument in support of this request is terse and undeveloped.  For all of these reasons, the Court denies Plaintiff's request for sanctions.