UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DRIVE LOGISTICS LTD,

              Plaintiff,

v.

PBP LOGISTICS LLC; PIECE BY
PIECE INVESTMENTS, INC.; and
LEAR CORPORATION,

              Defendants.

_____/

Case No. 14-10289

Paul D. Borman
United States District Judge

R. Steven Whalen
United States Magistrate Judge

**OPINION AND ORDER:**
**1) GRANTING DEFENDANT LEAR CORPORATION'S RENEWED**
**MOTION FOR SUMMARY JUDGMENT; AND**
**2) DENYING PLAINTIFF DRIVE LOGISTICS LTD'S RENEWED**
**MOTION FOR SUMMARY JUDGMENT**

In this action, Plaintiff Drive Logistics, Inc. ("**Drive**") seeks to collect

payment from Lear Corporation ("**Lear**") for freight shipments that Drive

transported on Lear's behalf. Drive maintains that Lear is liable based on the bills of

lading that were issued in connection with each shipment; Lear contends that Drive

agreed to collect payment only from an intermediary between the companies, and

also waived any legal claims against Lear, when it entered into a contract called the

Master Transportation Agreement with the intermediary.

In July of 2016, Judge Gerald E. Rosen, who was presiding over this matter

at the time, denied the parties' first round of cross-motions for summary judgment,

and permitted limited additional discovery on a potentially dispositive issue: whether the Drive employee who signed the Master Transportation Agreement had actual or apparent authority to do so. The parties have now filed Renewed Motions for Summary Judgment. For the reasons stated below, the Court will deny Drive's Renewed Motion for Summary Judgment and grant Lear's Renewed Motion for Summary Judgment.

## I.     BACKGROUND

### A.     Factual Background

On July 20, 2016, Judge Rosen entered an Opinion and Order in this action denying cross-motions for summary judgment similar to those now before this Court. (ECF No. 99 ("**July 2016 Opinion**").) As further detailed below, Judge Rosen denied both motions after finding that there was a jury question on an issue central to both parties' arguments: whether the Drive employee who signed the MTA on his company's behalf had actual or apparent authority to do so, and therefore whether Drive Logistics is bound by the Master Transportation Agreement's waiver provision. (*See* July 2016 Opinion at 33-34.) Judge Rosen also permitted additional discovery limited to that issue, since the record was mostly silent on it, and since the issue is potentially dispositive of all remaining claims in this action. (*See id.* at 36; ECF No. 105.) The instant Motions were filed after that discovery was completed.

The factual background below is divided into two parts. The first part

summarizes the relationships between the parties and the events giving rise to this lawsuit, and it is based primarily on the factual findings set forth in Judge Rosen's July 2016 Opinion. The Court fully incorporates those findings here, providing the summary below only by way of general background. The second part discusses the circumstances surrounding the alleged execution of the Master Transportation Agreement; it is based primarily on evidence collected during the limited discovery period and submitted as exhibits to the parties' Motions for Summary Judgment.

### 1. General Background

Drive is a freight company headquartered in Windsor, Ontario. Lear manufactures automotive parts. Co-Defendants Piece by Piece Investments, Inc. and its subsidiary PBP Logistics LLC (collectively "**PBP**") were transportation brokers. Both PBP entities are now defunct, according to testimony of their president and co-owner Alexander Jones. PBP largely failed to participate in this litigation, prompting Judge Rosen to enter default judgments against them on claims asserted by both Drive and Lear. (*See* July 2016 Opinion at 3-4 & n.2; ECF Nos. 31, 89.)

Prior to the events of this lawsuit, Lear retained non-party Ryder Integrated Logistics ("**Ryder**") as a logistics provider. In 2010 or 2011, Ryder enlisted PBP to transport Lear's freight on a route between Lear's supplier in Brownsville, Texas and Lear's facility in Hammond, Indiana. The agreement between Ryder and PBP made clear that PBP were not to subcontract those responsibilities to other carriers

3

without Ryder's prior written permission. (*See* July 2016 Opinion at 4-5; ECF No. 109, Lear Mot. at 8.) A separate memorandum issued by Ryder and signed by PBP reiterated that "brokering to other carriers of loads tendered to [PBP] by Ryder . . . on behalf of its shipper clients . . . is strictly prohibited[.]" (*Id.* at 5.) PBP further agreed in the memorandum to indemnify Ryder and its clients for any claims resulting directly from PBP's subcontracting to other carriers in violation of the agreement and the memorandum. (*See id.*)

All the same, PBP arranged for third-party carriers to shoulder PBP's responsibilities under the agreement without seeking Ryder's approval: non-party Sunbelt Transportation for the first few months of the agreement, and Drive beginning in late 2012. PBP themselves owned neither office space nor trucks at the relevant time. Through PBP, Drive thus carried freight for Lear on the Texas-Indiana route for roughly nine months in 2013. (*See id.* at 5-6 & nn.3-4.)

In the course of discovery for this litigation, PBP produced a "Master Transportation Agreement" ("**MTA**") that states on its face that it was executed between Drive and PBP on March 31, 2011. The MTA is not signed by a representative of PBP, but it is initialed and signed by an employee named Jeff Cameron on behalf of Drive. (*See* July 2016 Opinion at 6, 32 n.16.) Although the MTA was executed approximately a year and a half before Drive agreed to carry freight for Lear, it appears to set forth terms governing the relationship between

Drive and PBP generally.[1] Paragraph 8 of the MTA relevantly provides as follows, with "Carrier" referring to Drive and "the Customer" referring generally to PBP's clients (including Lear):

> [PBP] shall pay Carrier 40 to 45 days after [PBP's] receipt of Carrier's invoice, shipper's bill of lading, signed clear delivery receipt and other documents required by [PBP] or [its] Customer. Carrier agrees that it shall not bill the Customer, shipper/consignee or any third party directly nor shall it communicate in any manner, directly or indirectly[,] with [PBP] customers, consignors, consignees[2] or any party other than [PBP] concerning the collection of any charges relating to transportation services accruing in connection with or as a consequence of this Contract; and waives any right it may otherwise have to proceed or commence any action against any Customer for the collection of any freight bills arising out of transportation services performed by [C]arrier under this contract.

(July 2016 Opinion at 6-7; *see also* Lear Mot. Ex. F, Master Transportation

---

[1] Lear was not the only PBP client for whom Drive carried freight, but there is apparently conflicting evidence in the record as to when exactly Drive first began carrying freight for PBP. Alexander Jones testified that Drive transported its first load for PBP in April 2011. (ECF No. 110, Drive Mot. Ex. A, Deposition of Alexander Jones 141:20-25.) Further, the MTA is dated March 31, 2011, and Jones testified that executing the MTA was a prerequisite for any carrier to move freight for PBP. (Alexander Jones Dep. 94:18-95:9.) At the same time, Drive president Steven Breault testified that Drive began carrying loads for PBP in early 2010. (ECF No. 110, Drive Mot. Ex. D, Deposition of Steven Breault at 9:24-11:19, 14:23-15:3.)

[2] "Consignor" and "consignee" have distinctive legal meanings in the freight context. The Federal Bill of Lading Act defines "consignor" as "the person named in a bill of lading as the person from whom the goods have been received for shipment," and "consignee" as "the person named in a bill of lading as the person to whom the goods are to be delivered." 49 U.S.C. § 80101(1)-(2).

Agreement at 4.) In other words, Drive agreed not to go around PBP by billing or otherwise communicating with PBP's clients.[3] And in the key MTA provision for the purposes of the instant Motions, the signatory to the MTA "waive[d] any right it may otherwise have to proceed or commence any action against any Customer for the collection of any freight bills arising out of transportation services performed by [C]arrier under this contract." (*Id.*)

The record shows that Drive's billing practices for freight charges incurred through its relationship with PBP were consistent with the MTA—both as to charges incurred for Drive's carrying Lear's freight on the Texas-Indiana Route, and as to charges incurred for Drive's carrying freight for PBP's other clients. Drive would submit proof of delivery and an invoice to PBP, which would in turn collect payment from Lear and then remit it to Drive. (*See id.* at 7-8.)

Drive did not receive payment for freight transport services that it provided to Lear between February and August of 2013. Lear claims that it paid PBP for all of these services; PBP evidently failed to forward the payments to Drive. After payments from PBP to Drive became "spotty" in mid-2013, Drive gave notice to

---

[3] The parties dispute whether Lear knew that Drive had been subcontracted by PBP to service the Texas-Indiana route in violation of PBP's agreements with Drive. Drive charges Lear with complete knowledge of the fact; Lear acknowledges that while its plant employees in Indiana were aware, their superiors within the company were not. (*See* ECF No. 114, Drive Resp. at 12-13; ECF No. 91 at 3-4.) This issue does not ultimately affect the outcome here, so the Court does not reach it.

PBP in July of that year that as of a "specific date" in the near future, it would no longer carry freight for them. Drive did not contact Lear about the payments owing, and the company's president testified that "we never contacted the customer directly in risk of being seen as someone who went around the broker, which can be detrimental to our business." (*Id.* at 8.)

Drive claims that it has not been paid for a total of 424 loads that it carried for Lear: 310 "inbound" shipments (*i.e.*, from Texas to Lear's facility in Indiana) and 114 "outbound" shipments (*i.e.*, from Indiana to Texas). Plaintiff asserts that each shipment is evidenced by a bill of lading, each of which was either signed or issued by Lear. For inbound shipments, the driver would present the bill of lading to a Lear employee on delivery, and the employee would sign and return it. For outbound shipments, Lear would generate a return bill of lading. (*See id.* at 9.)

### 2. The MTA

Drive contends that under the bills of lading, Lear is responsible to Drive for the amounts that Lear paid to PBP but which PBP failed to remit to Drive. Lear takes the position that Drive waived all claims against Lear in paragraph 8 of the MTA. In the July 2016 Opinion, Judge Rosen stated that "[f]or present purposes, at least, Lear does not dispute Plaintiff's contention that the bills of lading, viewed in isolation, would subject Lear to primary or joint liability for the freight charges sought by Plaintiff here." (*Id.* at 14.) Accordingly, the question of whether Drive's purported

waiver of all claims against Lear in the MTA is enforceable is a dispositive one, and so the circumstances surrounding the alleged execution of the MTA merit careful consideration.

### i. Drive's account

Jeff Cameron was the Drive employee who initialed and signed the MTA, and his testimony in the record is drawn both from a sworn Declaration that he submitted in 2015, and from a deposition taken in March 2017, after Judge Rosen permitted discovery on the "actual or apparent authority" issue. (ECF No. 110, Drive Mot. Ex. E, Cameron Declaration; Ex. H, Deposition of Jeff Cameron.) Both Cameron and Steven Breault, Drive's president at the relevant time, acknowledged that it is in fact Cameron's signature on the MTA. (Cameron Dep. 39:23-40-2; ECF No. 110, Drive Mot. Ex. D, Deposition of Steven Breault at 22:22-23:7.)

Cameron worked for Drive as a "planning administrator." (Cameron Dep. 16:3-4.) In that capacity, he "would receive the load sheets,[4] enter the information into our [Truckmate] system, and just make sure the information was correct and

---

[4] "Load sheets" are informational documents that Drive receives from customers when they book Drive's services. Drive employees like Cameron who work in the dispatch group enter information from load sheets into a database called Truckmate. (Cameron Decl. ¶ 2.) Cameron testified that load sheets "would usually have a company logo at the top, pick up address, delivery address, normal full addresses, and any pertinent information, special instructions, dock numbers, the customer's broker, usually the agreed upon rate" and a place for the Drive employee to sign and date the form. (Cameron Dep. 24:20-25:10.)

spelling was right and the addresses are accurate and everything that was pertinent on the load sheets made their way into the system." (Cameron Dep. 16:5-12.) Asked in his deposition whether he signed or initialed any other documents in the course of his duties as a planning administrator, Cameron testified that he typically signed or initialed

> any sort of appendices that seemed to be just like authorization for doing the business. Anything like a major, I don't know -- no, no, just anything that was load sheet related was my department. Stuff that came through load sheets, that's what I signed. It was usually stuff that was already established between [Business Development Manager] Clark [Brockman] and the customer.

(Cameron Dep. 26:24-27:10; *see also* Breault Dep. 10:8-14.) While Cameron did interact with customers, he would typically "talk to the customer, be nice to the customer, get some preliminary details, [and] possibly answer questions if we had availability in the area," but when it came to "negotiations, that was [Brockman]." (Cameron Dep. 26:8-23.) Cameron was expressly authorized by Brockman to sign some documents, but it was generally

> made clear by the customer who was able to sign a document. If someone was sending me a document, they knew my role. Any time a conversation would get serious about, like, dollar amounts, whatever, they knew that they would have to go up from me because I'm just a planning administrator, the guy at the keyboard, the data entry guy.
> . . . If they're doing business with us, they know what I did, and they knew what Clark did and they knew the difference.

(Cameron Dep. 22:4-19.) Immediately after that testimony, Cameron testified as

follows regarding what would happen at the beginning of a customer relationship:

> Q. And if it's the very beginning of a relationship, they wouldn't know, would they?
> A. Well, they wouldn't be sending me something to sign per se.
> Q. Well, they might send something for someone to sign, correct?
> A. Possibly.
> Q. And if they sent it to Mr. Brockman and he handed it to you to sign, you would do that. . . .
> [A.]: Like, in the moment I couldn't -- it depends. . . .
> Q. If Mr. Brockman received a document and handed it to you and said 'hey, I just got this, sign it and send it back', would you do that or would you not follow his instructions? . . .
> [A.]: It would depend on the situation. . . .
> Q. Describe a situation in which Mr. Brockman handed you a document and instructed you to sign it and return it to the origin and you wouldn't do that. . . .
> [A.]: I can't remember a situation.

(Cameron Dep. 22:20-23:23.)

Cameron testified that he had no recollection of signing the MTA, that he "did not know how [his] signature got there[,]" and that he did not knowingly sign the agreement. (Cameron Dep. 39:18-22.) In his Declaration, Cameron characterized his signing of the MTA as probably unintentional, averring that "[t]he only thing I can think of is that I signed for the receipt of some load building documentation and this document was included within that documentation." (Cameron Decl. ¶ 4.) He elaborated in his deposition:

Q. . . . So you believe this document or this page might have been slipped in with some load building documentation and you just signed it semi-automatically?

A. Like, might have been just to keep things moving. Like, if I signed something I wasn't supposed to sign, someone would tell me.

Q. Okay. So somehow this document was slipped in and you signed it with other documents and moved it along?

A. Mm-hmm.

Q. Do you have any idea how it would have gotten back to PBP after that?

A. It appears to have been faxed.

Q. And that would have been you doing that, correct? . . .

[A.]: Not at that hour. . . .

Q. You're referring to the 8:18 p.m?

A. Yeah.

Q. Is that when you sent it or received it?

A. That's a good question too.

Q. When -- so your theory is that this was in a bunch of documents and you just signed it along with the other documents, correct?

A. Right.

Q. Would it make sense that you would have initialed the bottom of every page in that scenario too, because these are your initials on the bottom of every page, aren't there?

A. Yes.

Q. So you would have viewed every page of this document, initialed every page of this document except the last one where you would have signed, correct?

A. Yes.

Q. And in all that process, you never realized this was not a load sheet?

A. I knew it wasn't a load sheet. I just thought it was something we needed to get going. If it was an important thing, the customer knows, it's not my department.

Q. Who told you to say that?

A. I just know that.

(Cameron Dep. 41:4-42:22.)

Cameron averred in his Declaration that he never discussed the MTA or any of its terms with anyone who worked for PBP, and more broadly that he "[is] not authorized to bind Drive to contracts and . . . never [has] been." (Cameron Decl. ¶¶ 3, 5.) On the other hand, he also testified that he never told any PBP employees or representatives that he was not authorized to sign any particular document. Asked if a situation ever arose in which he had to tell PBP that he lacked the authorization to sign a particular document, Cameron responded that PBP personnel he dealt with were "familiar with my role, that's all I know." (Cameron Dep. 44:8-19.)

Cameron testified that he had received no formal guidance, documentation, or training concerning the scope of his authority. (Cameron Dep. 18:12-15.) Karen Hutt testified on behalf of Drive itself,[5] and confirmed that "[t]here was no written policy that detailed the authority to bind Drive Logistics[,]" and that this information would have been communicated to the employee at the time of hire." (ECF No. 110, Drive Mot. Ex. G, Deposition of Karen Hutt at 31:14-20; 32:21-22.) Hutt testified that Drive was not aware of any documents or communications that were shared with

---

[5] Fed. R. Civ. P. 30(b)(6) provides that an entity party, if named as a deponent, must "designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on its behalf; and it may set out the matters on which each person designated will testify. . . . The persons designated must testify about information known or reasonably available to the organization. . . ."

PBP or any other outside parties concerning who within the company was authorized to sign contracts for it. (Hutt Dep. 35:1-21.) Hutt also testified that Cameron was not authorized to sign or initial documents besides load sheets, but that Brockman had signing authority and knew who else in the company would be authorized to sign an agreement like the MTA. (Hutt Dep. 37:13-23, 39:25-40:24, 41:19-42:20, 43:19-22.)

Breault averred in a sworn Declaration that "[n]either I or nor any of Drive's senior managers had even seen the [MTA] before it was produced by PBP's counsel in December 2014. Neither I nor any of Drive's senior managers had ever discussed any 'master agreement' with PBP. This document was not anywhere in our records." (Drive Mot. Ex. C, Declaration of Steven Breault at ¶ 8.) Both Breault and Cameron testified that they had no recollection of seeing the MTA prior to this litigation. (Breault Dep. 21:25-22:7; Cameron Dep. 39:12-22.) Hutt testified that she reviewed "the emails that were communication between Drive and primarily Aaron Jones or members of PBP" and found no evidence that Aaron Jones emailed the MTA to Brockman, but also acknowledged that she did not have access to the email server that would have been in use at that time. (Hutt Dep. 27:9-28:22.)

### ii. PBP's account

As for PBP, testimony from PBP co-owner and president Alexander Jones and his brother Aaron (vice president and also a co-owner of PBP) suggests that

requiring subcontractors like Drive to sign agreements like the MTA was not only PBP's standard practice, but was in fact a prerequisite condition that PBP would impose before allowing any subcontractor to carry freight for PBP and their clients. (Alexander Jones Dep. 95:1-9, 100:21-24, 101:4-6; ECF No. 110, Drive Mot. Ex. F, Deposition of Aaron Jones 30:10-19, 40:7-10.) Aaron Jones further testified that the MTA provision restricting the subcontractor from contacting PBP's customers was typically scratched off by subcontractors, though he could not recall whether that was true in Drive's case. (Aaron Jones Dep. 43:17-44:3.) As noted above, there is conflicting evidence as to whether Drive first started carrying freight for PBP in 2010 or 2011, but the MTA is undisputedly dated 2011. Thus, to any extent Drive worked with PBP prior to March 31, 2011, there is no documentary evidence in the record that the relationship was governed by an MTA at that time.

As a vice president at PBP, Aaron Jones's responsibilities included "[m]aintaining the daily operations, managing all the operational staff, the account managers, [and] managing the carrier department." (Aaron Jones Dep. 16:13-24.) Jones was also responsible for sending master agreements like the MTA to subcarriers with whom PBP was going to do business. (Aaron Jones Dep. 29:17-30:12.) He testified that to the best of his recollection, he sent the MTA to Brockman—who undisputedly had the authority to sign the MTA—to be signed:

Q. Do you remember any contact with either [Drive account manager Clark Brockman or Drive president Steven Breault] concerning this agreement?

A. No.

Q. Okay. Do you think it's possible you alerted one of them that it would be coming?

A. I talked to Clark every day, all day. I'm sure I communicated with Clark rather than Jeff that it was coming over.

Q. So you think you told Clark it was coming over and when you got it back, Jeff had signed it?

A. Yes, I talked to Clark every day, all day, probably more than Steve talked to Clark.

Q. Do you believe you sent it to Clark?

A. Probably so. I'm trying to think back then, I probably sent it in the e-mail. I'm sure it probably went to Clark rather than Jeff.

Q. Okay. When you got it back you were ready to proceed to the next step?

A. Yes.

Q. At any point in time did either Piece by Piece Investments or Drive Logistics want to revisit this agreement?

A. No.

Q. Enter into a new one?

A. No.

Q. This agreement was in effect for the entire time that Piece by Piece Investments and Drive Logistics were doing business, as far as you know?

A. Correct.

Q. Would Drive Logistics have been awarded any freight to carry for Piece by Piece Investments without having signed this agreement?

A. No.

Q. Do you recall Mr. Brockman acknowledging the existence of the agreement at any time?

A. Yes.

Q. Describe that.

> A. He knew in -- I mean, we both knew it could not be done without us moving freight. So somewhere within our communication we both approved, hey, this contract has been done. I don't recall a specific date or time but we both knew this contract was done in order to move forward.
> Q. They would not have been able to carry freight?
> A. Correct.
> Q. I believe you said this was common in the industry, correct?
> A. Yes.

(Aaron Jones Dep. 39:3-40:25.) Jones further testified that in general, conversations about whether a carrier would carry freight for a particular PBP customer would have been held with an employee of the carrier who, like Brockman, had "operational control." (Aaron Jones Dep. 50:5-12.)

Regarding PBP's knowledge as to who at Drive had the authority to bind the company by contract, Aaron Jones testified that he knew managerial staff members such as Breault and Brockman would have had the authority to sign agreements like the MTA (Aaron Jones Dep. 48:8-12), and that he understood Cameron's role at Drive to be more secretarial than managerial. (Aaron Jones Dep. 36:12-19, 41:24-42:7, 48:19-21.) At the same time, however, he testified that while he could not remember whether he noticed that the MTA bore Cameron's signature when Drive returned it to him, he did not find it surprising that Cameron signed the document:

> Q. Do you remember how quickly they signed and sent it back?
> A. Maybe 10 minutes. It's a common thing in transportation. It's not really a send it to your boss or send it to your supervisor kind of deal.

Q. So they would have signed this on about the first day of operation of Piece by Piece Investments?

A. Definitely.

Q. Did you notice when you received it back that Jeff Cameron was the one who signed it?

A. At the time, I don't recall.

Q. Does it surprise you that Jeff Cameron is the person who signed this on behalf of Drive Logistics?

A. No.

Q. Was it your understanding that Jeff Cameron was somebody who would be authorized to sign a document like this on behalf of Drive Logistics?

A. Yes, sure.

Q. Did he have a position at Drive Logistics that would be common for him to sign this on behalf of the trucking company?

A. The way they operate, I think he was the one who signed it on a daily basis.

Q. So you understood he signed documents like this daily?

A. Yes.

Q. Not just for you but for others?

A. Correct. . . .

Q. Did anyone at Drive Logistics ever communicate to you that this -- that signing a document like this was beyond Mr. Cameron's authority?

A. No.

Q. And you said you had frequent contact with Clark Brockman and Steve Breault?

A. Daily.

Q. Daily contact with them?

A. Maybe even hourly.

(Aaron Jones Dep. 37:11-39:2.) When asked what he would have done if anyone had suggested to him that Cameron was not authorized to sign the agreement, Jones testified that he would have re-sent it to Brockman or Breault and asked them to sign

it. (Aaron Jones Dep. 44:12-18.)

It is undisputed that Drive never expressly represented to PBP that Cameron had the authority to bind the company. (Breault Decl ¶¶ 9, 11; Hutt Dep. 35:1-21, 41:19-42:26, 43:19-22.) Nevertheless, Drive performed consistently with the terms of the MTA until PBP began failing in their payments to Drive. Judge Rosen described Drive's performance in the following way:

> Consistent with the terms of the MTA — and inconsistent with [Drive's] contention that the bills of lading should control the determination of liability for Plaintiff's freight charges — Plaintiff submitted invoices for its freight charges to the PBP Defendants, along with proof of delivery, and the PBP Defendants would then pay Plaintiff for its services. Also consistent with the terms of the MTA — and, more specifically, paragraph 8 of this agreement, which contains the waiver provision that Lear seeks to invoke here — Plaintiff made no attempt to communicate with Lear regarding its unpaid freight charges until October of 2013, well after Plaintiff terminated its relationship with the PBP Defendants in late July or August of 2013.

(July 2016 Opinion at 29-30 (citing Breault Dep. at 12-13, 30-31, 33-36).)

### 3.    Relevant Procedural History

On January 22, 2014, Drive filed this action against Lear and PBP. (ECF No. 1, Compl.) In the Complaint, Drive asserted three claims against Lear: breach of contract (Count V), unjust enrichment (Count VI), and breach of implied contract (Count VII). The Complaint also included three claims against PBP: breach of contract (Count I), promissory estoppel (Count II), and account stated (Count III).

(The Complaint did not contain a Count IV.) Along with its Answer and Affirmative Defenses, Lear asserted three cross-claims against PBP: breach of contract, indemnification, and conversion/breach of fiduciary duty. (ECF No. 13.)

Judge Rosen granted Drive's motion for default judgment against PBP on April 21, 2014. (ECF No. 31.) The parties (including PBP) then engaged in discovery for approximately a year, and on June 30, 2015, Judge Rosen granted Lear's motion for default judgment against PBP and dismissed claims that PBP had previously asserted against Lear. (ECF No. 89.) This left only Drive's three claims against Lear for breach of contract, unjust enrichment, and breach of implied contract, over which Drive and Lear had filed their first set of cross-motions for summary judgment a few days before the default judgment against PBP was entered in Lear's favor. (ECF Nos. 80, 82.)

Judge Rosen ruled on those cross-motions in the July 2016 Opinion. In it, Judge Rosen analyzed the pair of Ninth Circuit cases cited by the parties as well as applicable Michigan law, and held that the fact that Lear was not a party to the MTA did not bar Lear from enforcing the waiver provision in the MTA against Drive, since that provision was broad enough on its face to encompass Drive's breach of contract claim against Lear. (*See* July 2016 Opinion at 15-25.) And although the parties had "extensively address[ed] the question whether Lear qualifies as a third-party beneficiary of the MTA" under Michigan law, Judge Rosen determined that

this issue was immaterial: having just held that a non-party can invoke a waiver that is broad enough to encompass the non-party under Michigan law, it was unnecessary to "conduct an inquiry into third-party beneficiary status." (*Id*. at 25 n.13.) Judge Rosen also rejected Drive's contention that the absence of PBP's signature on the MTA rendered it unenforceable. (*See id.* at 28.)

Judge Rosen went on to explain that while the record "demonstrates the existence of an agreement between Plaintiff and the PBP Defendants that encompasses at least some of the terms set forth in the MTA, it is another matter whether the record establishes Plaintiff's assent to the specific provision that Lear seeks to enforce here — namely, the waiver provision . . ." (*Id*. at 30.) Breault's testimony that there was no written agreement memorializing the business relationship between Drive and PBP weighed against this. Judge Rosen held that

> [i]f Lear is to overcome this testimony and establish as a matter of law that Plaintiff is bound by the MTA's waiver provision, it must demonstrate Plaintiff's assent to this specific provision, and Lear's showing on this point rests solely on the signature of one of Plaintiff's employees, Jeff Cameron, that appears on the last page of the MTA.

(*Id*. at 30-31.) Absent any evidence that Cameron had been granted actual authority, this question would turn on whether Cameron had apparent authority. And since the evidence in the record did not establish as a matter of law either that he did or that he didn't, Judge Rosen denied summary judgment to both parties, while at the same time stating that it would "entertain a request from the parties to reopen discovery

for the limited purpose of exploring this specific issue." (*Id.* at 31-34.)

Finally, Judge Rosen denied summary judgment to both parties on the unjust enrichment and implied-contract claims because those claims also turned on the question of apparent authority. This was for two reasons. First, the MTA's waiver provision broadly waived "any right" on Drive's part to bring "any action . . . for the collection of any freight bills," and Drive did "not contend that this provision, if enforceable, would extend to less than all of the theories of recovery it has asserted against Lear, nor [did] the Court see any basis for drawing such a distinction." (*Id.* at 34.) Second, Judge Rosen stated that under Michigan law, implied contracts cannot exist where an express contract covers the same subject matter, and concluded that any implied-contract theories of recovery would have to await resolution of the express-contract claim. (*See id.* at 35.)

On July 28, 2016, Lear filed a Motion to Reopen Discovery, which was opposed by Drive but ultimately granted. (ECF Nos. 102-105.) As the parties conducted discovery on the apparent-authority issue, the case was reassigned to this Court on December 27, 2016. The parties then filed Renewed Motions for Summary Judgment on April 28, 2017. (ECF No. 109, Lear Mot.; ECF No. 110, Drive Mot.) Timely Responses followed on May 19, 2017 (ECF No. 113, Lear Resp.; ECF No. 114, Drive Resp.), and timely Replies on June 2, 2017 (ECF No. 115, Lear Repl.; ECF No. 116, Drive Repl.).

This Court conducted a hearing on the parties' cross-motions on July 6, 2017, and now issues the following ruling.

## II.     LEGAL STANDARDS

Summary judgment is appropriate where the moving party demonstrates that there is no genuine dispute as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56(a). "A fact is 'material' for purposes of a motion for summary judgment where proof of that fact 'would have [the] effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties.'" *Dekarske v. Fed. Exp. Corp.*, 294 F.R.D. 68, 77 (E.D. Mich. 2013) (Borman, J.) (quoting *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984)). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

"In deciding a motion for summary judgment, the court must draw all reasonable inferences in favor of the nonmoving party." *Perry v. Jaguar of Troy*, 353 F.3d 510, 513 (6th Cir. 2003) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). At the same time, the non-movant must produce enough evidence to allow a reasonable jury to find in his or her favor by a preponderance of the evidence, *Anderson*, 477 U.S. at 252, and "[t]he 'mere possibility' of a factual dispute does not suffice to create a triable case." *Combs v.*

*Int'l Ins. Co.*, 354 F.3d 568, 576 (6th Cir. 2004) (quoting *Gregg v. Allen–Bradley Co.*, 801 F.2d 859, 863 (6th Cir. 1986)). Instead, "the non-moving party must be able to show sufficient probative evidence [that] would permit a finding in [his] favor on more than mere speculation, conjecture, or fantasy." *Arendale v. City of Memphis*, 519 F.3d 587, 601 (6th Cir. 2008) (quoting *Lewis v. Philip Morris Inc.*, 355 F.3d 515, 533 (6th Cir. 2004)).

When the Court is faced with cross-motions for summary judgment, the Court "must evaluate each motion on its own merits and view all facts and inferences in the light most favorable to the nonmoving party." *Westfield Ins. Co. v. Tech Dry, Inc.*, 336 F.3d 503, 506 (6th Cir. 2003). "The fact that the parties have filed cross motions for summary judgment does not automatically justify the conclusion that there are no facts in dispute." *Ely v. Dearborn Heights School Dist. No. 7*, 150 F. Supp. 3d 842, 849-50 (E.D. Mich. 2015) (citing *Parks v. LaFace Records*, 329 F.3d 437, 444 (6th Cir. 2003). In this context, a plaintiff and a defendant have different burdens:

> In a defensive motion for summary judgment, the party who bears the burden of proof must present a jury question as to each element of the claim. *Davis v. McCourt*, 226 F.3d 506, 511 (6th Cir. 2000). Failure to prove an essential element of a claim renders all other facts immaterial for summary judgment purposes. *Elvis Presley Enters., Inc. v. Elvisly Yours, Inc.*, 936 F.2d 889, 895 (6th Cir. 1991).
> When the moving party also bears the ultimate burden of persuasion, the movant's affidavits and other evidence not only must show the absence of a material fact issue, they also must carry that burden. *Vance*

> *v. Latimer*, 648 F.Supp.2d 914, 919 (E.D. Mich. 2009); *see also Resolution Trust Corp. v. Gill*, 960 F.2d 336, 340 (3d Cir. 1992); *Stat–Tech Liquidating Trust v. Fenster*, 981 F.Supp. 1325, 1335 (D. Colo. 1997) (stating that where "the crucial issue is one on which the movant will bear the ultimate burden of proof at trial, summary judgment can be entered only if the movant submits evidentiary materials to establish all of the elements of the claim or defense").
>
> The plaintiff therefore "must sustain that burden as well as demonstrate the absence of a genuine dispute. Thus, it must satisfy both the initial burden of production on the summary judgment motion—by showing that no genuine dispute exists as to any material fact—and the ultimate burden of persuasion on the claim—by showing that it would entitled to a directed verdict at trial." William W. Schwarzer, et al., The Analysis and Decision of Summary Judgment Motions, 139 F.R.D. 441, 477-78 (1992) (footnotes omitted).

*Ely*, 150 F. Supp. 3d at 849-50.

Finally, all evidence submitted in opposition to a motion for summary judgment must ultimately be capable of being presented in a form that would be admissible at trial. *See Alexander v. CareSource*, 576 F.3d 551, 558–59 (6th Cir. 2009) ("[T]he party opposing summary judgment must show that she can make good on the promise of the pleadings by laying out enough evidence that will be admissible at trial to demonstrate that a genuine issue on a material fact exists, and that a trial is necessary.").

## III.     DISCUSSION

### A.     Law of the Case

"Under the doctrine of law of the case, findings made at one point in the

litigation become the law of the case for subsequent stages of that same litigation."

*Moore v. Mitchell*, 848 F.3d 774, 776 (6th Cir. 2017) (quoting *United States v. Moored*, 38 F.3d 1419, 1421 (6th Cir. 1994)). The doctrine

> bars relitigation of issues that were decided at an earlier stage of the litigation, either explicitly or by necessary inference from the disposition of the case, unless one of three "exceptional circumstances" exists: (1) where substantially different evidence is raised on subsequent trial; (2) where a subsequent contrary view of the law is decided by the controlling authority; or (3) where a decision is clearly erroneous and would work a manifest injustice.

*United States v. Barnwell*, 617 F. Supp. 2d 538, 543 (E.D. Mich. 2008) (citations and quotation marks omitted), *aff'd*, 364 F. App'x 240 (6th Cir. 2010).

The following issues were explicitly decided by Judge Rosen in the July 2016 Opinion, and therefore constitute law of the case for the purposes of the parties' Renewed Motions for Summary Judgment.

First, Michigan law applies "in determining the scope and effect of the MTA's waiver provision." Judge Rosen reached this determination based on an express term in the MTA providing for the applicability of Michigan law, and on both parties' citations to Michigan law in their arguments on Lear's third-party beneficiary status and on the question of who had the authority to bind Drive to the MTA. (July 2016 Opinion at 22-23 n.11.) This Court will also apply Michigan law to the dispositive question of apparent authority, which is more germane to the enforceability of the MTA than its scope or effect, because the parties have again cited Michigan law (as

25

well as federal cases applying it) in their arguments on that topic.

Second, if the MTA was validly executed, it binds Drive notwithstanding that Lear itself was not a party to the MTA, and notwithstanding that the MTA was not signed by a representative of PBP. Judge Rosen held that Michigan law supports the proposition that "a non-party to a contract [may] invoke a contractual waiver or release that, by its terms, is broad enough to encompass the non-party." (July 2016 Opinion at 22-25 & n.3 (citing *Romska v. Opper*, 234 Mich. App. 512 (1999) and *Collucci v. Eklund,* 240 Mich. App. 654 (2000)).) Judge Rosen then concluded that "[a]pplying this principle of Michigan law here, the waiver provision in the MTA allegedly executed by Plaintiff unquestionably is broad enough to encompass the breach of contract claim asserted by Plaintiff against Defendant Lear." (July 2016 Opinion at 24.) Judge Rosen also rejected Drive's argument that PBP's failure to sign the MTA made it unenforceable, holding that the argument lacked support in Michigan law, and that record evidence independently confirmed PBP's consent to be bound by the MTA. (*Id.* at 28-29.)

Third, Michigan law's recognition "that a contractual waiver or release is not limited in its reach to the contracting parties, but may also confer benefits on third parties" (*id.* at 22) renders several other issues raised by the parties immaterial to the adjudication of the instant Motions. These include: (1) Lear's third-party beneficiary status under Mich. Comp. Laws § 600.1405; (2) the related issue of whether Lear

must "stand in the shoes" of PBP and thus inherit any limitations on the ability to enforce the agreement that PBP would have; and (3) the effect of the Ninth Circuit cases that the parties have invoked in their arguments over whether the bills of lading may be displaced by the MTA: *C.A.R. Transp. Brokerage Co. v. Darden Restaurants, Inc.*, 213 F.3d 474 (9th Cir. 2000), and *Oak Harbor Freight Lines, Inc. v. Sears Roebuck, & Co.*, 513 F.3d 949 (9th Cir. 2008).[6]

> Finally, Judge Rosen explained in the July 2016 Opinion that
>
> the waiver provision in the MTA is not limited to any particular theory of recovery. Rather, it broadly waives "any right [Plaintiff] may otherwise have to proceed or commence any action against any Customer [of the PBP Defendants] for the collection of any freight bills arising out of the transportation services performed by [Plaintiff] under" the MTA. (MTA at ¶ 8.) Plaintiff does not contend that this provision, if enforceable, would extend to less than all of the theories of recovery it has asserted against Lear, nor does the Court see any basis for drawing such a distinction.

(July 2016 Opinion at 34.) Drive has not addressed this point in any of its briefs on the instant Motions, and therefore has not provided any reason for this Court to

---

[6] Judge Rosen comprehensively addressed these three issues in the alternative, concluding that Lear in fact qualifies as a third-party beneficiary under Mich. Comp. Laws § 600.1405 (*see* July 2016 Opinion at 25 n.12), that the "stand in the shoes" limitation does not apply here given the parties' clear intent as expressed in the MTA (see *id.* at 27-28), and that even if *C.A.R.* and *Oak Harbor* governed this case, they do not require a finding that the allocation of liability in the bills of lading trumps the MTA (see *id.* at 20-22). This Court adopts Judge Rosen's reasoning as to these issues as well.

determine that the waiver provision, if enforceable, does not apply to its implied contract and unjust enrichment claims as well as its breach of express contract claim. For that reason, the issue of apparent authority is dispositive on all three of the claims that remain in the action.

**B.    Cross-Motions for Summary Judgment**

Drive maintains that Cameron lacked actual authority to bind Drive to the MTA. Lear does not expressly concede this point, but it also does not argue it. Accordingly, this Court adopts Judge Rosen's conclusion that the issue of apparent authority, rather than actual authority, is dispositive here because "resolution of this issue, in turn, will determine the outcome of Lear's appeal to the waiver provision in the MTA as a defense to Plaintiff's breach of contract claim . . ." (July 2016 Opinion at 34.)

Judge Rosen held that neither party was entitled to summary judgment on the apparent-authority issue because as of July 2016, the record was "wholly silent as to the PBP Defendants' belief or understanding regarding Mr. Cameron's authority to sign the MTA on Plaintiff's behalf," and almost as silent as to Cameron's own perceptions of the MTA and his authority generally. (*Id.* at 33-34.) Those evidentiary gaps in the record have now been filled, and this Court concludes in light of the new evidence that Lear is entitled to summary judgment on all three remaining claims.

Under Michigan law, "[p]ersons dealing with an agent may rely on apparent

authority and such authority is to be gathered from all of the facts and circumstances properly admitted into evidence." *Innotext, Inc. v. Petra'Lex USA Inc.*, 694 F.3d 581, 589 (6th Cir. 2012) (citing *Grinnell v. Carbide & Carbon Chems. Corp.*, 282 Mich. 509 (1937)). "Apparent authority arises where the acts and appearances lead a third person reasonably to believe that an agency relationship exists ... [h]owever, apparent authority must be traceable to the principal and cannot be established only by the acts and conduct of the agent." *Chires v. Cumulus Broad., LLC*, 543 F. Supp. 2d 712, 717 (E.D. Mich. 2008) (citing *Hertz Corporation v. Volvo Truck Corporation*, 210 Mich. App. 243, 246 (Mich. App. 1995))

The doctrine of apparent authority has three distinct elements:

(1) the person dealing with the agent must do so with belief in the agent's authority and this belief must be a reasonable one, (2) the belief must be generated by some act or neglect on the part of the principal sought to be charged, and (3) the person relying on the agent's authority must not be guilty of negligence.

*VanStelle v. Macaskill*, 255 Mich. App. 1, 10 (2003) (quoting *Grewe v. Mt. Clemens Gen. Hosp.*, 404 Mich. 240, 252-53 (1978)).

The third party's reasonable belief in the existence of an agency relationship can be traceable to an omission or omissions by the principal, in addition to affirmative acts. *See Little v. Howard Johnson Co.*, 183 Mich. App. 675, 683 (1990) (citing *Sasseen v. Community Hosp Foundation*, 159 Mich. App. 231, 238 (1986)).

The instant Motions present two parallel questions to this Court. First,

drawing all inferences in Lear's favor, has Drive has shown in its Renewed Motion for Summary Judgment that no reasonable jury could find that Cameron had apparent agency to bind Drive to the MTA? Second, drawing all inferences in Drive's favor, has Lear has shown in its own Motion that a reasonable jury could *only* find that Cameron had apparent authority in that regard? For the reasons below, the Court answers the first question in the negative but the second question in the affirmative. Accordingly, the Court will deny Drive's Renewed Motion for Summary Judgment, and grant Lear's Renewed Motion for Summary Judgment.[7]

### 1.    Drive's Renewed Motion for Summary Judgment

Drive makes a three-pronged argument for summary judgment in its favor. First, Drive argues that it never agreed to waive all rights to collect from Lear, and that Lear has failed to establish that any authorized representative of Drive signed the MTA. Second, Drive argues that even if it is enforceable, the MTA cannot modify the terms of the express contract between Drive and Lear in the bills of lading under the Ninth Circuit decisions *C.A.R.* and *Oak Harbor*. Third, Drive argues that as a third-party beneficiary, Lear can only enforce the MTA to the same extent that PBP could, and PBP would have no rights in this regard because they substantially

---

[7] The parties dispute whether the evidentiary standard applicable here is "preponderance of the evidence" or "clear and convincing evidence." Because the Court concludes that the outcome would be the same under either standard, the Court need not reach this issue.

breached their obligations under the MTA.

The second and third aspects of Drive's argument were already addressed by Judge Rosen in the July 2016 Opinion. Drive's argument based on *C.A.R.* and *Oak Harbor* essentially reiterates its earlier argument that the MTA (to which Lear was not a party) cannot modify the terms set forth in the bill of lading, but this Court finds for the reasons stated earlier that whatever *C.A.R.* and *Oak Harbor* have to say about this case, Michigan law is clear that the MTA's waiver provision can supersede the MTA's allocation of liability. Likewise, Judge Rosen rejected Drive's argument based on the "stand in the shoes" principle in the July 2016 Opinion, both because Lear need not qualify as a third-party beneficiary to enforce the MTA under Michigan law, and because the terms of the MTA contain countervailing evidence as to the parties' intentions that outweighs that rule of construction here. As Drive has not materially changed these arguments from the form they took in its last summary judgment motion, the Court sees no reason to upset these determinations.

Any case Drive may make for summary judgment in its favor must be based on an argument that Cameron lacked both actual authority and apparent authority to bind Drive to the MTA. Drive first claims that Cameron did not have actual authority, but there is no substantial dispute over this; the crucial issue is whether Cameron had apparent authority. On that point, Drive asserts that Lear has failed to show that Drive took any affirmative steps to hold out Cameron as having the

requisite authority, and that Lear has failed to show that any belief in Cameron's authority on PBP's part was reasonable.

Drive mischaracterizes Lear's burden when it states that "Lear must prove that, by something Drive's principals said or did to PBP, Drive conveyed to PBP that Jeff Cameron was its agent for executing important master agreements that limited Drive's ability to seek payment for its services." (Drive Mot. at 31.) Michigan agency law is clear that to support a finding of apparent authority, the third party's reasonable belief in the agent's authority "must be generated by some act *or neglect* of the principal." *Little*, 183 Mich. App. at 683 (emphasis added); *VanStelle*, 255 Mich. App. at 10. Not all instances of neglect by principals will create apparent authority, of course: the doctrine requires that the neglect "generate" a "reasonable belief" in the third party that the agent is acting within his or her authority. *See id.*

Several factors in this case, taken together, strongly favor a finding that PBP's belief in Cameron's authority was traceable to Drive. First, it is undisputed that Drive never communicated any limitations on Cameron's authority to PBP or to any other outside parties. Second, Aaron Jones testified that before he sent the MTA to Drive to be signed, he was "sure [he] communicated with Clark [Brockman] rather than Jeff [Cameron] that it was coming over." (Aaron Jones Dep. 39:8-10.) Jones then confirmed that to the best of his recollection, he "told [Brockman] it was coming over and when [he] got it back, Jeff had signed it[.]" (Aaron Jones Dep. 39:11-14.)

Although there are some ambiguities in Jones's testimony,[8] they must be drawn in Lear's favor at this point, and the narrative that thus emerges is that Jones informed Brockman (who everyone agrees had the requisite authority) that he would be sending the MTA, sent it, and then received back a copy of the MTA that was either initialed or signed on every page by a person Jones knew to be Brockman's employee. Third, Drive performed in accordance with the MTA after it was sent back to PBP, by submitting invoices to and collecting payment from PBP, and by refraining from contacting Lear directly when PBP began to miss payments that it

---

[8] Drive makes much of these ambiguities, but all they prove is that Aaron Jones did not have a specific recollection of a conversation with Brockman regarding the terms of the MTA or the MTA in general. This does not contradict his testimony that he was "sure [he] communicated with Clark rather than Jeff," since that perception was independently supported by his recollection that at a different time he "moved a piece of business from [his previous company] to [PBP], and Clark was the only one [he] talked to." (Aaron Jones Dep. 39:8-10, 47:20-25.)

Drive also asserts in its Renewed Motion that "Mr. Jones never sent the alleged agreement to either" Breault or Brockman. (Drive Mot. at 14, 20.) Drive supports this factual proposition by citing a portion of Breault's Declaration, in which Breault averred that "[n]either I or nor any of Drive's senior managers had even seen the document before it was produced by PBP's counsel in December 2014." (Breault Decl. ¶ 8.) This may be evidence that Breault himself never saw the MTA before this litigation. But as to whether *Brockman* ever saw it, Breault's averment is minimally probative if it is based solely on firsthand personal knowledge, and likely inadmissible hearsay if it is based on anything Brockman said to Breault. Breault's Declaration thus fails to fully counteract Aaron Jones's testimony that he was confident he sent the MTA to Brockman.

There is in fact no testimony from Brockman in the record at all, which is a significant omission given that if anyone at Drive besides Cameron saw the MTA in 2011, all indications are that it would have been Brockman. The omission is even more significant given Aaron Jones's testimony that he did in fact recall Brockman acknowledging after the fact that the MTA had been executed.

owed to Drive. These facts in tandem are more than enough to justify a conclusion that an act or omission by Drive generated a belief on PBP's part that Cameron had authority to sign the MTA.

There is no real dispute that PBP subjectively believed in Cameron's authority, but as Drive points out, that belief must be reasonable. Again drawing all reasonable inferences in Lear's favor, this Court cannot conclude that no reasonable jury could find PBP's belief to be reasonable. The facts set forth in the paragraph above strongly suggest that PBP's belief was reasonable even by themselves: Aaron Jones sent the MTA to (or at least communicated about it with) a person who clearly had the authority to sign the document, and then had it promptly returned to him with every page initialed or signed. Other evidence that supports this conclusion includes Jones's testimony that he understood Cameron to be an employee who signed documents like the MTA daily (Aaron Jones Dep. 37:19-38:12), Hutt's testimony that Drive never communicated any limitations on Cameron's authority to PBP (Hutt Dep. 35:1-21.), and Aaron Jones's testimony that an agreement like the MTA is "a common thing in transportation. It's not really a send it to your boss or send it to your supervisor kind of deal." (Aaron Jones Dep. 37:13-15.)

Drive takes specific issue with the last of those points, arguing that notwithstanding Jones' testimony, any belief that Cameron, who was not a member of senior management, "would have the authority to waive Drive's recourse to seek

payment for a million dollars' worth of services" is *per se* unreasonable, as is Jones's statement that the MTA is "not really a send it to your boss or send it to your supervisor kind of deal." (Drive Mot. at 33.) But Drive's assertion is conclusory and unsupported by any evidence that within the freight industry norms and practices prevailing at the time, these beliefs would have been unreasonable. The testimony of Aaron Jones, who had worked in the industry for nearly a decade before the MTA was signed (Aaron Jones Dep. 7:2-17:9), amounts to competent evidence that PBP's belief was reasonable, which Drive has thus failed to rebut.

The fact that Drive performed consistently with the MTA has another, larger significance here. Michigan recognizes the doctrine of ratification, in which a principal's after-the-fact conduct can give the unauthorized actions of the agent the same legal effect as they would have had they been authorized. The Michigan Supreme Court defines the doctrine in this way:

> "Ratification is the affirmance by a person of a prior act which did not bind him but which was done or professedly done on his account, whereby the act, as to some or all persons, is given effect as if originally authorized by him." . . .
> "Affirmance is either . . . (a) a manifestation of an election by one on whose account an unauthorized act has been done to treat the act as authorized, or . . . (b) conduct by him justifiable only if there were such an election."

*David v. Serges*, 373 Mich. 442, 444 (1964) (quoting Restatement (First) of Agency §§ 82, 83 (1933)); *see also Gorman Golf Prod., Inc. v. FPC, L.L.C.*, No. 295201,

2011 WL 4424349, at *5 (Mich. Ct. App. Sept. 22, 2011) ("As an example, ratification by a principal would include the acceptance of the benefits of an agreement 'with knowledge of the material facts.'") (quoting *Echelon Homes, L.L.C. v. Carter Lumber Co.*, 261 Mich. App. 424, 432 (2004)). "Although Michigan cases in which ratification has been discussed usually have involved receipt of direct benefits by the ratifying principal, evidence of receipt of benefits, while it lends plausibility to an allegation of ratification and, indeed, may in itself constitute ratification, . . . is not a *sine qua non* of ratification." *David*, 373 Mich. at 444 (citing *Bacon v. Johnson*, 56 Mich. 182, 185 (1885) and *Langel v. Boscaglia*, 330 Mich. 655, 659 (1951)).

There is evidence in the record that even if Cameron lacked apparent authority to bind Drive to the MTA, Drive ratified the MTA by affirmance under *David*. Drive submitted invoices and proof of delivery to PBP, and thereafter collected payment from PBP for the individual shipments. (Breault Dep. 12:2-13:21, 30:24-31:6.) As Judge Rosen noted, this is "inconsistent with [Drive]'s contention that the bills of lading should control the determination of liability for [Drive]'s freight charges." (July 2016 Opinion at 29.) Additionally, as required by paragraph 8 of the MTA, which also contains the waiver provision at issue in this case, Drive made no attempt to contact Lear regarding the payment deficiencies from PBP's first missed payment in February 2013 until October 2013—well after the relationship between Drive and

PBP had been terminated. (Breault Dep. 31:12-16, 33:4-36:24.)

Other testimony by Breault tells a different story about whether Drive's actions with respect to PBP represent affirmation of the MTA. Breault testified that there was never a written document memorializing the contractual or business relationship between Drive and PBP. (Breault Dep. 11:6-8, 27:10-13.) Further, Breault acknowledged that Drive never contacted Lear about the missing payments, but chalked that up to business judgment, testifying that in general Drive "never contacted the customer directly in risk of being seen as someone who went around the broker, which can be detrimental to our business." (Breault Dep. 32:22-33:3.) This testimony reasonably permits the alternative inference that Drive invoiced and was paid by PBP pursuant to an informal arrangement between the companies, rather than doing so because the MTA required it to; it also permits the alternative inference that Drive waited until after its working relationship with PBP was over to contact Lear due to professional courtesy, rather than contractual obligation. Thus, while there is solid evidence of ratification in the record, it is not without limitations.

To overcome Lear's waiver defense, as it must do to justify summary judgment in its favor, Drive must show that there are no genuine issues of material fact regarding any of the elements of the apparent authority doctrine or the ratification doctrine, such that no reasonable jury could conclude that Cameron had apparent authority *and* no reasonable jury could conclude that Drive ratified

Cameron's signing of the MTA. Drive has not met this burden. There is compelling evidence that Cameron had apparent authority to take the action that he did, and there is at least a genuine issue of material fact as to whether Drive ratified that action through subsequent conduct. The Court will therefore deny Drive's Renewed Motion for Summary Judgment as to its breach of express contract claim. Further, because the Court finds for the reasons set forth below that Lear can enforce the MTA's waiver provision against Drive under the doctrine of apparent authority, the Court will also deny Drive's Motion for Summary Judgment as to its implied contract and unjust enrichment claims, since Judge Rosen held (and this Court agrees that) the MTA's waiver provision encompasses those claims.

### 2. Lear's Renewed Motion for Summary Judgment

To obtain summary judgment in its favor on its waiver defense, and thus on Drive's claims overall, Lear must show that there is no genuine issue of material fact as to the elements of apparent authority, or alternatively that there is no genuine issue of material fact as to the elements of ratification. In other words, Lear has two options. It can prevail on a theory of apparent authority if it can demonstrate the absence of any genuine fact questions over (1) whether PBP reasonably believed in Cameron's authority to sign the MTA, (2) whether that belief was generated by some act or neglect on Drive's part, and (3) whether PBP was non-negligent in forming that belief. *See VanStelle*, 255 Mich. App. at 10. Alternatively, Lear's waiver defense

may prevail on a ratification theory if the record shows that no genuine fact questions would preclude any reasonable jury from finding either that (1) Drive in some way manifested its assent to the MTA after it was signed and returned to Drive, or (2) Drive engaged in conduct that was justifiable only if it had agreed to the be bound by the MTA. *See David*, 373 Mich. at 444.

As explained above in the discussion of Drive's Renewed Motion for Summary Judgment, there are genuine fact issues germane to the question of ratification here. Consequently, this Court is not prepared to hold that no reasonable jury could find that Drive's interactions with PBP and its lack of contact with Lear were for any reason other than Drive's after-the-fact assent to the MTA. This Court does conclude, however, that the record reflects no genuine issues of material fact as to whether Cameron had apparent authority to sign the MTA on Drive's behalf.

There is no dispute that PBP subjectively believed that Cameron possessed the authority to bind Drive to the MTA. The contested issues are therefore whether PBP's belief was reasonable, whether it can be traced to one or more acts or omissions by Drive, and whether PBP was in some way negligent in forming it.

For the reasons stated in the discussion of Drive's Renewed Motion for Summary Judgment, *supra*, this Court concludes that no reasonable trier of fact could find that PBP's belief in Cameron's authority to sign the MTA was unreasonable. This conclusion is most strongly supported by the testimony of Aaron

Jones that he was in frequent communication with Brockman prior to the signing of the MTA;[9] that he very likely informed Brockman before sending the MTA that it was coming; and that very shortly after he sent it, he received back a copy that was initialed or signed on every page by Cameron, whom Jones knew worked under Brockman. Equally important here is Aaron Jones's testimony that he was not (or would not have been) surprised to learn that Cameron signed the document on behalf of Drive, given his perception based on "[t]he way they operate[ that] he was the one who signed" documents like the MTA both for PBP and for other clients "on a daily basis." (Aaron Jones Dep. 37:22-38:18.) In light of all of this, as well as Aaron Jones's testimony that at the relevant time he "talked to [Brockman] every day, all day, probably more than [Breault] talked to [Brockman]," and further taking into account the fact that neither Cameron nor any other employee of Drive ever communicated any limitations on Cameron's authority to PBP, no reasonable jury could conclude that PBP's belief that the MTA was signed by a person with authority

---

[9] The Court notes that while Aaron Jones testified less than definitively that he was "sure [the MTA] probably went to Clark rather than Jeff" (Aaron Jones Dep. 39:17-18), Jones's testimony still generates a strong—if not wholly unrebuttable—inference that Jones in fact did so. Breault's vouching for Brockman's having never seen the MTA in his Declaration is considerably less probative on that point (not to mention potential hearsay), especially given the absence of any testimony from Brockman himself. The Court is thus not required to assume that Brockman never saw the MTA in the spirit of drawing reasonable factual inferences in Drive's favor.

to sign it was unreasonable.[10]

In a similar vein, the Court concludes that a reasonable trier of fact could only determine that PBP's belief in Cameron's authority was traceable in substantial part to acts or omissions by Drive. As with the "reasonable belief" question examined above, the evidence in the record does not merely require denial of summary judgment to Drive, but is in fact also compelling enough to justify the conclusion that Lear is entitled to judgment as a matter of law on the issue. To begin with, it is undisputed that Drive made no representations to PBP that Cameron's authority was limited in any way. Not every failure by a principal to expressly limit its agent's authority will generate a reasonable belief in third parties as to that authority; what makes the omission significant here is the third party's awareness that the agent *was*

---

[10] The parties argue vigorously over whether the MTA was a boilerplate or otherwise commonplace agreement, and (relatedly) the extent to which the Jones brothers entered into agreements like the MTA with any other business partners—or with Drive at any other times. As noted above, the record contains conflicting testimony on whether Drive began carrying freight for PBP in 2010 or 2011. The record is also obscure as to whether an agreement like the MTA was executed between Drive and Camryn Logistics, the company that the Jones brothers worked for before they bought PBP in late 2010 or early 2011. (Alexander Jones Dep. 52:24-53:6; Aaron Jones Dep. 38:13-16; Hutt Dep. 23:8-24:7, 49:20-24.) .
At this stage, the Court must resolve in Drive's favor any factual ambiguities as to the frequency with which PBP entered into agreements like the MTA, but doing so does not materially alter the Court's analysis of how reasonable PBP's belief in Cameron's authority was. That analysis depends primarily on the evidence regarding Aaron Jones's interactions with and perceptions of Drive and its employees, and so the analysis would be materially unchanged even if the MTA were the first agreement of its kind that PBP had ever entered into.

given similar if more limited authority in other respects. Cameron testified that he did have authority to bind Drive by signing some types of documents, such as load sheets or trailer use authorizations. That Drive made no indication as to any limits on that authority made it more reasonable for a third party to conclude, as Aaron Jones in fact did, that Cameron signed documents like this "on a daily basis." (Aaron Jones Dep. 38:4-12.) Also relevant here is Jones's testimony that if he had been given any indication that Cameron lacked the authority to sign the MTA, he would have sent the document to Brockman or Breault for their signature. Moreover, PBP's belief that Cameron had the authority to sign the MTA was rendered even more reasonable by Drive's failure to notify him at any point after it sent the MTA back to PBP, and by Drive's subsequent performance consistent with the terms of the MTA, as discussed above.[11]

This leaves the question of whether PBP, "the third person relying on the

---

[11] The act of sending the initialed and signed MTA back to Aaron Jones could also be an act to which PBP's reasonable belief could be traceable, were it not for a gap in the record regarding who actually sent it. "Apparent authority . . . cannot be established only by the acts and conduct of the agent," *Chires*, 543 F. Supp. 2d at 717 (quoting *Hertz Corporation*, 210 Mich. App. at 246), and so if the MTA was sent to PBP by a Drive employee other than Cameron, that act could qualify as additional evidence of apparent authority. Cameron had no recollection of sending it, and also testified that it was unlikely that it was him in any case, given the hour the fax was sent. At the same time, there is no evidence that anyone else sent it, or any indication as to who besides Cameron might have. This ambiguity must be resolved in Drive's favor in adjudicating Lear's Motion, so the Court cannot regard the faxing of the executed MTA to be an "act of the principal" for present purposes.

agent's apparent authority[, was] guilty of negligence." *VanStelle*, 255 Mich. App. at 10 (quoting *Grewe*, 404 Mich. at 252-53). Drive argues that PBP negligently breached its duty to inquire into the scope of Cameron's agency, and cites *Cutler v. Grinnell Bros.*, 325 Mich. 370 (1949), for the proposition that "[o]ne dealing with an agent is bound to inquire into the extent of his authority, not from the agent, in the absence of written evidence thereof, but from the principal, if accessible . . . ." *Id.* at 376.

*Cutler* does represent a limitation imposed by Michigan law on the doctrine of apparent authority, but it is one that is distinguishable from the present case. *Cutler* involved a contractor who installed basement electrical wiring at a retail branch manager's behest, and later sued the manager's company after the company refused to pay him because it had not given the manager approval to authorize the job. *Id.* at 371-73. The Michigan Supreme Court reversed the trial court's judgment for the contractor, noting that there was "nothing in the record to indicate that plaintiff made any attempt to find out from the defendant whether the branch manager had authority to have the basement rewired." *Id.* at 377. But critical to the *Cutler* court's holding was the fact that the contractor "had already been put on notice" that in that specific context, the manager "had only limited authority . . . ." *Id.* Not long before, the contractor had performed an initial electrical wiring job for the same parties in the same location; when the contractor gave his estimate to the

manager for the first job, the manager said that he would need approval from his company, which the company denied, prompting the contractor to submit a lower quote that was then accepted. *Id.* at 371-72. The court in *Cutler* relied on this fact in holding that the contractor had a duty to inquire into the manager's authority. The court also found that "[a] further indication that plaintiff had notice or knowledge of the local manager's lack of authority to have the basement rewired [was] shown by the amount involved[,]" since the amount that the contractor quoted for the second job (and which the manager approved without due authorization) was considerably more than the amount the company had agreed to for the first job. *See id*. In short, *Cutler*'s duty of inquiry appears to be limited to situations in which the third party has a specific reason to believe that the agent's authority is limited in the particular context at issue. *Cutler* does not compel a finding that PBP was negligent in relying on Cameron's apparent authority to bind Drive to the MTA, and for the same reasons that the Court holds as a matter of law that it was reasonable for PBP to believe Cameron had the requisite authority, the Court concludes that no reasonable jury could find that PBP was negligent in relying on Cameron's apparent authority.

Because a reasonable jury could only conclude that PBP reasonably believed in Cameron's authority to bind Drive to the MTA, that PBP's belief was traceable to acts or omissions by Drive, and that PBP was not negligent in forming that belief, this Court holds that the MTA's waiver provision is enforceable by Lear against

Drive. Drive therefore "waive[d] any right it may otherwise have to proceed or commence any action against any [Lear] for the collection of any freight bills arising out of transportation services performed" pursuant to the MTA. (Lear Mot. Ex. F, Master Transportation Agreement at 4.) Accordingly, the Court will grant summary judgment to Lear on Drive's breach of express contract, unjust enrichment, and implied contract claims.

## IV.    CONCLUSION

For all of the reasons stated above, the Court hereby DENIES Drive's Renewed Motion for Summary Judgment (ECF No. 110), and GRANTS Lear's Renewed Motion for Summary Judgment (ECF No. 109).

IT IS SO ORDERED.

s/Paul D. Borman
Paul D. Borman
United States District Judge

Dated: September 29, 2017

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on September 29, 2017.

s/D. Tofil
Deborah Tofil, Case Manager